### No. 2518.—John M. Prather v. The City of New Orleans.

The municipal government set up by the military authority of the United States for the city of New Orleans, which continued from 1862 to 1866, and administered the affairs of the city by officers appointed by the military authority, was not the government of a conqueror. The doctrine in relation to contracts made by an occupying conqueror in reference to property of the conquered, from which he is afterward expelled, or which he is required by treaty to give up, has no application to contracts made by such municipal officers.

A contract made by the city, under the authority of an ordinance of the Common.Council, whereby the steam ferry privileges were sold to a third person for a given period of time, was therefore binding and obligatory upon the city, even though the officers in possession of the city government at the time the contract was made, were superseded by officers appointed or elected by the city herself before the term of the contract had expired.

In this case it was held, that inasmuch as the city government that succeeded the one by which the steam ferry privileges had been given, had repealed the ordinances of the former Council which authorized the contract, and had taken the contracts for the steam ferry privileges away from the contractor and given them to another person, the first contractor was entitled to recover from the city the damages which the violation of his contract had caused him.

APPEAL from the Fourth District Court, parish of Orleans. *Théard, J. Billings & Hughes,* for plaintiff and appellant. *George S. Lacey,* for defendant and appellee.

Howe, J. This is a suit for damages. On the sixteenth January, 1866, by ordinance No. 6412, the government of the city of New Orleans, as then constituted, directed the Mayor to advertise for sealed proposals for the sale of the steam ferry privileges from foot of Canal street and foot of Esplanade street, for a term of ten years from June 1, 1866.

On the fifth of February, 1866, by ordinance 6425, the Mayor was authorized to enter into contracts with the plaintiff (presumably the highest bidder), in accordance with the specifications of the advertisement.

On the nineteenth February, 1866, the contracts were duly passed before the city notary, and on the twenty-first February, 1866, were each indorsed as follows by the military commander of the Department of Louisiana:

"Contracts of this character should not have been made by the city government in its present anomalous and inchoate condition; but as this contract does not trench upon any portion of the wharf or levee space reserved for the use of the general government, *it is approved*, subject to the condition that this approval shall not prejudice any right of the United States to any levee batture, or prejudice or determine any private right or interest."

Shortly after a new set of municipal officers were elected, John T. Monroe being Mayor; and on the twenty-fifth May, 1866, by ordinance 60, N. S., the Controller was authorized to sell for a term of ten years the same rights which had been conferred on plaintiff.

On the twenty-ninth May, 1866, the ordinance 6425, under which the contracts with plaintiff had been made, was repealed.

On the first June, 1866, the plaintiff made a written demand on the Mayor to be put in possession, or, in the language of his letter, "have my bonds and contracts returned to me."

In December, 1866, the ferries in question were let to other parties. In May, 1867, this suit was begun. The court below gave judgment for defendant, and the plaintiff appealed.

*First*—It is contended by the defendant that the city government established in New Orleans during the war, and commonly known as the bureau system, had "no legislative powers," such powers being expressly withheld from it by the military orders creating it. If by "legislative powers" is meant the power to make laws, we might agree with the defendant's view; but if it is contended that this bureau government could not pass such ordinances as those above quoted, Nos. 6412 and 6425, we can not assent to the proposition. The ordinances in question were merely mandates from the authorities charged with the administration of the ferries to the Mayor to administer them in a certain way.

It is matter of history that for nearly four years the government established by military authority passed ordinances of this character, and that this was done with the permission, at least, of the military power.

Moreover, the contracts in this case, and necessarily the action preliminary thereto, were specially approved, as we have seen, by the military commander.

*Second*—But it is claimed that on the ninth February, 1866, the same military commander prohibited the municipal authorities from making such contracts as those before us, and that his special approval of these particular contracts on the twenty-first February, 1866, was so limited and conditional as not to cure the want of power produced by his general prohibition. We can not assent to this construction. He approved of the contracts. So far as his approval was necessary to render legal the action of the municipal authorities, it was given. Their power to make the contract was completed, and their liability to observe its obligations was also complete. The condition attached was evidently meant to prevent possible infringement, not on the rights of parties to the contract, but of outside parties.

*Third*—It is further contended by the defendant that the laws in force at the time these contracts were entered into, required "all contracts to be made or let by authority of the City Council, and all materials and supplies to be furnished to be offered by the Mayor at public auction, after the usual advertisements, and adjudicated to the lowest bidder." We apprehend this point was made through inadvertence. The city in this case had something to sell, not. to hire or buy, and she was surely not required to sell to the lowest bidder. The statute quoted, act of 1850, page 164, § 22, refers to work to be done for or supplies to be furnished to the city, and the authorities cited, 12 An. 154, 496, and 15 An. 667, have the same reference.

*Fourth*—It is contended by defendant that the plaintiff voluntarily abandoned his contracts with the city by his letter of June 1, 1866, above quoted. We can not concur in this view. The letter was superfluous and inartificial. The city had already actively violated its obligations by repealing the ordinance 6425 and re-offering the privilege for sale. The right of action was complete, and the letter contains no voluntary remission thereof. On the contrary, we understand it to express a desire on the part of the plaintiff either to proceed with his contract or to formally repudiate its further obligation, and possibly to sue for damages. At all events, we can not easily presume from his language that he intended to donate his damages.

*Fifth*—It is finally contended by the defendant, and this was the basis of the judgment in its favor in the court below, that the contracts in question, "even if lawful and binding upon the contracting parties" at the time they were entered into, ceased with the existence of the particular form of municipal government under which they are made, and in support of this proposition we are referred to the familiar principle that any contracts or agreements which the conqueror may make with individuals farming out the property of the conquered, will continue only so long as he retains control of such property, and will cease on its restoration to or recovery by its former owner.

The effect of such a view would be a little singular in this case. The contracts made on the nineteenth February, 1866, by which the plaintiff was to be put in possession of the ferry privileges on the first of June, 1866, are admitted to be "lawful and binding;" yet by the change of city government in the intervening month of April or May, they are made unlawful and of no binding effect.

But we can not recognize the application to this case of the principle of international law quoted by defendant. The municipal government established by military authority, and continuing without interruption from 1862 to 1866, was one of the series of municipal governments which have in times past administered the affairs of the corporation. It was, during nearly four years, in quiet possession, without the shadow of an adverse claimant. Its officers were recognized as the municipal officers by every department of government, State and national. The doctrine in relation to contracts made by an occupying conqueror in reference to property of the conquered, from which he is afterwards expelled, or which he is required by treaty to give up, has no application to the contracts made by such municipal officers. They were not occupying conquerors. The city of New Orleans, their principal, was not an occupying conqueror. They were not contracting in regard to the property of some third and conquered person. They contracted in regard to the property of the city, which was then in possession of the city as owner, and is still in its possession. As to the city, there has never been any change of possession or control as owner. She was owner in January, 1866, and she was owner when this suit was brought. She has changed her officers, but how can such change effect "lawful and binding" contracts made by their predecessors?

But if it be granted that these municipal authorities in some way represented and acted for the United States as occupying conqueror, the conclusion desired by defendant does not follow.

In the case of Leitensdorfer v. Webb, 20 Howard, 176, where the question was of the validity of a provisional government established in New Mexico in 1846 by a military commander, and especially of the continuing effect of its laws and judicial system, a similar point was made, but the court replied: "The fallacy of this pretension is exposed by the fact that the territory never was relinquished by the conqueror, but was retained by the occupant until possession was matured into permanent dominion and sovereignty, and this, too, under the settled purpose of the United States never to relinquish the possession acquired by arms."

Applying this undoubted principle to the case at bar, and admitting for the moment that the contracts in question were made on behalf of an occupying conqueror, we should only find that the occupation still

continued, not by military force, it is true, but by civil dominion and sovereignty. The Confederacy did not retake New Orleans; and to-day New Orleans, like Boston, is within the national domain.

We think the plaintiff entitled to recover, and we fix the amount of damages, from the evidence, at $11,280, with interest from judicial demand.

It is therefore ordered that the judgment appealed from be reversed, and that plaintiff, John M. Prather, have judgment against the defendant, the city of New Orleans, for the sum of $11,280, with legal interest from May 10, 1867, and costs of both courts.