## Lackey v. Fayetteville Water Company.

### Opinion delivered July 23, 1906.

1. Municipal corporation—power to contract—waterworks.—A municipal corporation is empowered by Kirby's Digest, § 5448, to contract with any person or corporation to construct and operate waterworks. (Page 125.)

2. Same—validity of contracts.—While the members of a city council are trustees for the people of the municipality which they represent, and are held to a stricter account than a mere private agent, yet when they act within the scope of their authority in making contracts, these contracts can not be set aside upon other and different principles than those that control other contracts. (Page 125.)

3. Same—power of courts to supervise contracts.—While the courts will not interfere to control the discretion of a city council to determine whether waterworks are necessary, and whether or not it will grant the franchise to private individuals to furnish the same, they will interfere to inquire whether the contract by its terms is so unreasonable and oppressive as to indicate that the council has transcended its authority and abused its powers by ignoring the rights of the people of the municipality. (Page 125.)

4. Same—fraud in contracts.—The courts will inquire whether there was actual fraud in the grant by a city council of a franchise to build and operate waterworks. (Page 126.)

5. SAME—EVIDENCE OF FRAUD.—Evidence that the president of a company which sought to procure from a city council a contract for furnishing water had frequent interviews in various places with members of the city council, that he told them that he did not think that they needed legal counsel, although he had employed counsel for himself, and that he prepared and submitted to the council a draft of the ordinances which they subsequently passed, is insufficient to show fraud in procuring the contract. (Page 126.)

6. SAME—INTEREST-BEARING INDEBTEDNESS.—Const, 1874, art. 16, § 1, providing that no municipality shall ever issue interest-bearing evidences of indebtedness, does not inhibit a city from contracting with the grantee of a waterworks franchise that, should the city fail to pay its water rentals when due, the deferred payments should bear interest. (Page 127.)

7. SAME—REGULATION OF WATER RATES.—Kirby's Digest, § § 5445-7, providing that a city council may fix reasonable rates to be charged for water, constitutes a part of every contract entered into between a city and water company after its passage. (Page 128.)

8. SAME—APPROPRIATION OF REVENUES.—A contract entered into by a city to pay to a water company a certain amount for hydrant rentals, which, together with other expenses already incurred by the city, would absorb all the present revenues of the city is not unlawful as an appropriation of the city's revenues in advance of their levy and collection. (Page 129.)

9. SAME—WATERWORKS FRANCHISE—LENGTH.—A grant by a city of a franchise for constructing and operating a system of waterworks for the period of twenty years will not be set aside by the courts as being for an excessive length of time. (Page 130.)

10. SAME—PRESUMPTION THAT COUNCIL DID ITS DUTY.—Where a city council passed an ordinance providing for a municipal water supply, it will be presumed that the council made a proper investigation to determine what would be the reasonable value of hydrant rentals before fixing the amount thereof. (Page 130.)

11. MUNICIPAL ORDINANCE—AMBIGUITY.—A city ordinance is not void for ambiguities if its meaning is discoverable when construed as a whole. (Page 135.)

12. SAME—VALIDITY.—An ordinance which in granting to a water company a franchise to construct and operate waterworks provides that the company shall construct and maintain a dam four or five feet high at a certain river, is not invalid because the company had not obtained a right of way to build such dam, nor because damage might result to property owners by reason of the construction thereof. (Page 136.)

13. SAME—AUTHENTICATION OF ORDINANCE.—Under Kirby's Digest, § 5473, providing that "all by-laws or ordinances shall, as soon as may be after their passage, be recorded in a book kept for that purpose,

and be authenticated by the signature of the presiding office of the council and the clerk," authentication by the acting mayor and acting recorder was sufficient. (Page 136.)

14. SAME—VALIDITY IN PART.—An ordinance containing separable provisions may be void in part and valid as to the residue if it appears that the council would have passed the ordinance with the invalid provisions eliminated. (Page 137.)

15. COSTS—ALLOWANCE IN EQUITY.—Where, in a suit by taxpayers to cancel a municipal contract for water supply, certain provisions of the contract were annulled, but the remainder was enforced, it was not an abuse of discretion to award costs to the defendant. (Page 138.)

Appeal from Washington Chancery Court; *James A. Rice,* Special Chancellor; affirmed.

## STATEMENT BY THE COURT.

J. S. Lackey and eighteen other taxpayers of the City of Fayetteville brought this suit in their own behalf and on behalf of all other taxpayers in the city to enjoin the appellee and the city from enforcing ordinance numbered 135 of the City of Fayetteville, alleging among other things:

"That the passage of said ordinance was procured by undue influence of the said water company in that J. H. McIlroy, the president thereof, unduly influenced J. H. Atha, a member of the council, to vote therefor by making him believe that the legal effect of the instrument prepared would be to only require the city to pay at the stated periods at which it could purchase, the actual value of its physical property, if it desired to purchase, and induced him to believe that the pressure was greater than required under the old ordinance, when in fact the city could not purchase at such prices, and when said pressure was, in effect, less than required under the old ordinance.

"That he induced W. W. Chapman to vote therefor by making him believe that under the new ordinance the pressure would be guarantied at the University greater under the new ordinance than was required by the old ordinance.

"That he induced C. W. Phillips, a member of the council, to vote for said ordinance by inducing him to believe that the opposition to it on the part of many citizens was on account of revenge, and that he induced each and every member of the coun-

cil who voted for it to believe that under this ordinance which they passed the water company guarantied to the city a greater pressure and the power to raise water to a greater elevation at the University than was required of the company under the old ordinance.

"That it is not true that under the new ordinance a greater pressure was guarantied at the University than under the old. By the terms of this new ordinance a stream was required to be raised 65 feet at some point south of the University on Dickson Street to be selected by the council, while in fact the highest point on Dickson Street south of the University was 56 feet lower than the lowest point of the basement of the University building, which fact was unknown to the members of the council and the required pressure would only require the water to be raised nine feet above the lowest point of the foundation of the building.

"That the said J. H. McIlroy, president of the water company, devoted the most of his time from the time the ordinance was introduced before the council in August until the final passage of ordinance 137 on the 9th day of November in preparing the ordinance so as to protect the interests of the water company, and in persuading the individual members of the council to vote for it.

"That each and every one of the members of the council who voted for said ordinance was induced to believe that the legal effect of the said ordinance number 135 was that the city could purchase, at the expiration of the periods named, the water plant by paying simply for the physical property a fair and reasonable value, and, had it not been that they so believed, none of the said members would have voted for the same.

"That none of said councilmen were lawyers or versed in matters of this character. That the president of the water company, with the aid of his counsel, wrote out the report of the chairman of the committee having in charge the consideration of said ordinance, and wrote out all of the amendments that he and his counsel prepared, and shaped the language of each and every one of said amendments. That the said chairman, W. W. Chapman, received the same from the hands of the president of the water company on Friday, the 23d day of October, 1903. That

he received at the same time said ordinance 135, which had been prepared by the water company and his counsel.

"That on Monday night, October 26, said W. W. Chapman and C. W. Phillips signed the report so prepared by the president of the water company and his counsel, the other members of the committee refusing to sign the same.

"That, through the influence of the president of the water company and his representations aforesaid and divers other representations, a majority of the council, believing the same, were induced to vote for said ordinance, and to pass the same by putting it upon its third reading the same night it was intro- duced; that the same had never been submitted to Hon. R. J. Wilson, attorney for the city, and he had no opportunity to examine into the report or the ordinance so amended, and that no citizen, outside of the council, had any knowledge or informa- tion that there would be an attempt to pass this ordinance at this time, and no one had an opportunity to point out and call atten- tion to the council to the objectionable features of the ordinance so passed.

"That the ordinance passed is void for the following reasons:

"First: Because it was procured by the undue influence aforesaid, and was passed without the members of the council vot- ing therefor understanding the legal effect thereof, and the same is a fraud on the rights of plaintiffs and other taxpayers.

"Second: Said ordinance is void for the reason that it seeks to fasten upon the city a bonded indebtedness as the only means by which it can be relieved of this ordinance when the city has no legal right to issue or create a bonded indebtedness.

"Third: Said ordinance is void because it seeks to make the city liable for interest-bearing indebtedness.

"Fourth: Said ordinance is void because it is unreasonable in this:

"(a) It is an attempt to grant to the water company an exclusive franchise for an unreasonable length of time, towit: 20 years.

"(b) It seeks to bind the city for the payment of hydrant rental at a fixed price for an unreasonable length of time.

"(c) It gives no assurance to the city to furnish a neces-

sary or sufficient amount of water for domestic and manufacturing purposes and fire protection.

"(d)    It gives no assurance of any definite pressure in case of fire.

"(e)    The city council had, prior to the passage of this act, granted to an electric light company a twenty-five year franchise by which it had agreed to pay certain sums annually, and, after having paid said sums, there is not sufficient revenue from the taxation of all said city property to the constitutional limit of five-mills to pay the amount that is contracted for under this ordinance for hydrant rental; and if all of the revenue of the city should be used for that purpose, there would be an annual deficit during the continuance of this franchise.

"(f)    It makes an arrangement for the payment of five cents per thousand gallons for water for sewers, when the city is absolutely deprived of means to pay for same.

"(g)    It provides no penalty whatever for a failure on the part of the water company to comply with any of its undertakings.

"(h)    By section nineteen of said ordinance it is attempted to provide a special rate of ten cents per thousand gallons to manufacturing industries that use an average of 10,000 gallons per day that use hydrant exclusively, which in effect is oppressive, aimed at sub-division of a class and by its terms is exclusive of two or three industries within the city limits.

"(i)    It is unreasonable in that it approximates a minimum rate to water consumers.

"(j)    It is unreasonable in that the rates so fixed are exorbitant.

"(k)    It is unreasonable in that it makes it impossible for the city under its terms to require the water company to make any future extensions.

"Fifth:    Said ordinance is void because it is contrary to the Constitution, the laws and policy of the State.

"(a)    It attempts to bind the city to pay a bonded indebtedness when under the Constitution and laws of the State it has no power to issue bonds.

"(b)    It attempts to bind the city to pay interest on indebtedness when the Constitution and laws of the State forbid the same.

80—8

"(*c*)   It attempts to fix the hydrant rental for a long and unreasonable length of time, which hydrant rentals amount to more than the amount derived from the legal assessment of all the property within the city limits.

"(*d*)   It attempts to delegate the legislative functions of the council to a board of arbitration for the purpose of determining the terms and conditions upon which the charter may be continued.

"(*e*)   It imposes conditions for future extensions which are unreasonable and can not be complied with in order to obtain the same.

"(*f*)   It imposes the condition of allowing the water company to mortgage its property for an additional sum of $1,250 for each hydrant that might be added under order of the council, the effect of which would be to prevent the council ordering fire hydrants where they are necessary, and is contrary to public policy.

"(*g*)   It creates a monopoly contrary to public policy.

"(*h*)   And in divers other respects it is contrary to the Constitution and statute laws of the State.

"Sixth:   Said ordinance is void for uncertainty in the following and other respects:

"(*a*)   The various terms employed in sections 7-17 and 21 leave it indefinite and uncertain as to what pressure is required from the water company.

"(*b*)   It is impossible to determine from the language of section 7 whether the "altitude................shall have the capacity' for supplying a population of 15,000, whether the reservoir, the mains, the plant or what it is that shall have a capacity.

"(*c*)   It is impossible to determine from section 14 how much water is to be consumed by each consumer, and how it is to be ascertained, what the surplus is for which the consumer shall be charged regular meter rate heretofore established.

"(*d*)   That section 17 is uncertain in that it fails to show what is necessary to call for the opening or closing of the valves: that it is not made the duty of any one, either of the water company or the fire department, to open or close these valves, and in

that it is impossible to determine how this pressure can with certainty be obtained in case of fire.

"(*e*)    Section 22 is uncertain and indefinite in that, attempting to define the *bona fide* indebtedness referred to in the ordinance, it says 'that it shall, if necessary, be fixed on the basis of $1,250 for each and every hydrant contracted for by the city as provided for in this ordinance,' etc., without defining what the necessity shall be, when it shall be determined, in what manner, and by whom the necessity shall be determined, and also it is uncertain in that it takes for a standard that which is uncertain and indefinite, and offers no means whatever of determining the value of the property."

There is an allegation that the ordinance as engrossed was never passed by the city council.

The complaint alleged "that for the reasons above, and divers other reasons, said ordinance is oppressive, unreasonable, unjust and arbitrary, and is a fraud upon the rights of the taxpayers." The prayer was for an injunction restraining the enforcement of the ordinance.

A supplemental complaint was filed, alleging:

"That since the filing of the original complaint, towit: On the 4th of November, 1903, the said council met together and confederating to make their constituents, the taxpayers of Fayetteville, pay more than double the value of the water plant and more than double the value of the water service, and in the interest of said water company claimed to have passed the following ordinance and caused the same to be published, towit: (Here ordinance 137 is inserted. Ordinance 137 is the same as ordinance 135, excepting section 12, which was amended as follows:)

" 'Section 12.    Said city, or improvement district embracing the entire city, shall have the right to purchase said water works at the expiration of ten years, fourteen years, and eighteen years, from the date of passage of this ordinance, including all extensions and appurtenances thereof by paying therefor the fair and equitable value thereof, which shall be fixed at the actual value of said water works, its lands, buildings, machinery and equipments, subject to any *bona fide* indebtedness that may exist thereon,' etc.

"That the majority of the council in passing this ordinance was actuated by a desire to further the interest of the water company, and was wholly disregarding the interest of its constitutents, and that a majority of said council well knew that they were compelling the city to pay more than double what the property was worth; more than double what the service of the water was worth. That no concessions of value were obtained for the city, and that it was oppressing the people, without any consideration therefor. That said council got together, without any notice or information to the citizens at large, and in the absence of the attorney employed to represent the city's interest, and without letting him know anything about such meeting, and passed said ordinance, without submitting the same to the city attorney or without advising him regarding same. That in passing the ordinance it was done at the instance and request of water company, and not at the instance and request of any of the citizens. That the same was procured by undue influence of said water company upon the individual members of the council. That they did not confer with or consult any of the petitioners, but consulted and conferred with those interested with the water company. Allege that two of the city council, C. W. Phillips and W. W. Chapman, have openly stated to the citizens of Fayetteville that the franchise they had granted to the water company was worth $50,000 or more. That the ordinance and franchise granted thereunder are a fraud upon the rights of the citizens, and are unreasonable and unjust. * * * That all the allegations made as to ordinance 135 are true as to ordinance 137. It adopts these and prays as in original complaint."

The answer of the water company, after various admissions and statements by way of explanation which we deem immaterial, denied all the material allegations of the original complaint. It "denied that the ordinance was procured by undue influence, as alleged by plaintiff; denied that the ordinance was prepared or passed in the interest of the company, and not in the interest of the citizens of the city, as in the complaint alleged; denied that at the time of the passage of the ordinance the value of the property of the water company did not exceed $25,000, and denied that the city was required to spend annually for water privileges a sum largely in excess of its total revenue, as alleged in com-

plaint; denied that the franchise in itself was worth $100,000 or any other considerable sum, and denied that the ordinance constituted a fraud upon the rights of the citizens or taxpayers or that it was unreasonable or unjust."

And, answering specifically the supplemental complaint, the water company denied that on the 4th day of November, 1903, the city council confederated together to make their constitutents, the taxpayers, pay more than double the value of the water plant and pay more than double the value of the water service, and that in pursuance of such purpose passed ordinance No. 137 referred to in the supplemental complaint. The water company admitted that the provisions of ordinance No. 137, set forth in the supplemental complaint, are substantially the same as those set forth in ordinance No. 135, approved October 26, 1903, and appended as exhibit to the original complaint, but denied that the majority of the council or any member thereof in passing the ordinance was actuated by a desire to further the interest of the water company and disregarded the interest of their constitutents; and denied that the council met without notice or information to the citizens and passed the ordinance; but on the contrary alleged that the ordinance was introduced and passed at a regular meeting of the council with the usual notice usually given of other business coming before the body; denied that the ordinance was procured by undue influence of the water company, or its agents, upon the individual members of the council, but alleged that after the passage of ordinance No. 135 the plaintiffs had instituted their suit against the water company and members of the council, alleging, among other things in their complaint, that ordinance No. 135 was irregularly passed by the council, and alleged that the water company was advised that the plaintiffs were relying upon some technicality or irregularity in the passage of the ordinance, and that, in order to remove any technical question as to the regularity of the proceedings and passage of ordinance No. 135, the council, at the request of the defendant, passed ordinance No. 137, which is substantially the same in its provisions as ordinance No. 135.

The defendants, J. T. Eason, Mayor, and J. P. Hight, W. W. Chapman, J. H. Atha, C. W. Phillips and Chas. O. Hansard, members of the city council, answered and adopted the answer

of the water company, in so far as the allegations and denials therein contained are applicable, and denied that they, or either of them, were prompted or induced in any manner as members of the council, or otherwise, by undue or improper influence of the water company, its officers or agents, to vote for ordinance No. 135, or ordinance No. 137; alleged that they acted with due deliberation in the passage of said ordinances, and at the time of the passage of the same they believed, and still believe, that the provisions of the ordinances were as favorable to the city as could be obtained; that the conditions and wants of the city demanded a more extensive service and better fire protection than could be procured under the original contract between the city and W. B. Rees and Chas. A. Rees; that their conduct in and about the passage of the ordinance was prompted solely by their best judgment of the necessities of said city and its inhabitants, and not by any improper influences brought to bear upon them.

The facts are substantially as follows:

On the 8th day of October, 1894, the City of Fayetteville contracted with Wm. B. and Chas. A. Rees for the construction of a waterworks system, and for that purpose granted to them the exclusive right to operate waterworks in the City of Fayetteville for twenty years. The works were constructed and put in operation under the ordinance, accepted by the city, and operated by the Reeses and their successor, the Fayetteville Water Company, until July, 1903.

The contract with the Reeses, as evidenced by the ordinance, is made an exhibit to the complaint. It is not necessary to set out its provisions. It was a contract whereby the Reeses, upon certain terms and conditions specified therein, undertook to supply with water the City of Fayetteville. In July, 1903, the stock of the Fayetteville Water Company passed into the hands of J. H. McIlroy and others who owned the stock at the time the ordinances in controversy were passed. At the time McIlroy and his associates acquired the waterworks, the franchise under the Rees contract had something more than eleven years to run. When the waterworks was first constructed, Fayetteville was a town of some 3,500 inhabitants. It had grown to be a city of some 5,000 or 6,000 inhabitants. There was evidence tending to show that, during the time the system was operated by its for-

mer owners, much dissatisfaction had arisen among the patrons of
the water company and with the service afforded the city, and
its inhabitants, on account of the failure to supply a sufficient
amount of water at times and also the failure to furnish the
desired and required quality of water. The mains and pipes had
become impaired to a great extent, as well as the machinery
and pumping facilities at the pumping station, and the reservoir
located upon East Mountain in the City of Fayetteville, had be-
come defective and incapacitated for storing the amount of water
required for the purposes of the city and its inhabitants and con-
tracted for by Rees Bros. under their original contract with the
city.

In March, 1903, the Fayetteville Water Company, doubtless
recognizing the necessity therefor, and realizing, too, that it might
be required to make extensions under the provisions of the Rees
contract, made a proposition to the city council to replace its four-
inch line on Dickson Street with a six-inch line, to make certain
extensions, and to build an additional reservoir to contain 750,000
gallons. The only condition imposed was that the city should
locate a hydrant every 450 feet on the new line. They did not
ask for an extension of their franchise when they proposed to
make these extensions and improvements in their plant. As
shown by the city records, this proposition was unanimously
adopted. But, notwithstanding this proposition had been made
and accepted, nothing was done under it, and the conditions
described remained and existed as they were when McIlroy and
his associates became the owners of the system. The testimony
shows that, in order to bring about the improvements demanded
and meet the requirements of the situation, an expenditure of
a very large amount of money, estimated by McIlroy to be
$25,000, was necessary. Rees estimated the amount of the cost
of the extensions proposed by him at $14,000, and they were not
as great as those proposed by McIlroy. The plant had cost
McIlroy and his associates $55,000, and he was not willing to
make the required improvements without an extension of the
franchise, and said he could not finance it without such extension.
There was no disposition on the part of the council to compel
him to make the extensions under the Rees ordinance. They
were unanimously in favor of extending the franchise, provided a

satisfactory contract with the water company could be obtained. McIlroy was anxious for the extension, and the council was willing to grant it on satisfactory terms. So negotiations were begun between them to see if the terms could be made satisfactory, which resulted, after about two or three months, in the ordinance here assailed. Any other facts deemed necessary are stated in the opinion.

The court declared the ordinances valid, except as to certain parts of sections, and found and decreed as follows:

The court found that part of section 10 which reads as follows: "Said city hereby agrees to pay a rental of $35 per annum for every such hydrant so rented and supplied additional to the 65 hydrants hereinbefore provided for" is unreasonable, and for that reason void, and for the reason that it binds future councils.

And that part of section 12 of said ordinance which reads as follows: "And in case the parties in interest should be unable to agree as to such value of such water company works, the same may be determined by experts, one to be selected by each of the parties in interest; and if they fail to agree on such value, they shall select a third person, also an expert, and the decision of any two of said experts shall be binding on all parties" is void as it attempts to delegate the power of the council to a board of arbitration and binds the council to the award.

Also that part of section 12 which reads as follows: "And, in case the said water company, its successors and assigns, and the city council can not agree on the terms of such extension, then it shall be determined by three persons, selected one by the water company, its successors and assigns, and one by the city council, and the two so chosen shall select a third" is void for reason that it is an attempt to delegate the powers of the council to arbitration.

That part of section 14 of ordinance 137, which reads as follows: "Water rent shall be due and payable monthly in advance from the owner of the property" is unreasonable and void.

That part of section 18 which reads as follows: "On the same terms as provided by section 10 of this ordinance and where there shall be on an average of at least one water consumer for each 100 feet of such extension who will contract and pay as

much as $15 per annum as rental" is void, because the same is unreasonable, and attempts to bind future councils.

That part of section 19 which reads as follows: "That use an average of 10,000 gallons per day and that use hydrant water exclusively" is unreasonable and void.

The court finds that there is no specific limitation in said ordinance, limiting the amount of incumbrances that might be placed on the defendant's waterworks plant, and the court finds all other issues in favor of the defendant.

The court decreed the parts of sections above referred to to be void, and held the remainder of the ordinances valid, and the water company is perpetually enjoined from enforcing the void sections.

The court perpetually enjoined the water company from bonding or mortgaging the plant for a sum exceeding $1,250 per hydrant installed by said company at the request of the council, and adjudged all cost to defendant.

*L. W. Gregg* and *B. R. Davidson,* for appellants.

1. Where a water company through its president misleads the members of a city council with reference to the effect of an ordinance as to material matters, and thereby procures its passage, such ordinance is void. Members of a city council, in discharging a public trust, are held to a stricter account than an ordinary agent. McQuillin, Mun. Ord. § 78; 49 Am. Rep. 416; 41 Atl. 454; 35 Ark. 75; 52 Ark. 541; Dillon, Mun. Corp. 445, and note; *Ib.* 915, and note, 17 Ark. 71; 35 Ark. 483; Smith, Mun. Corp. 739.

2. The ordinance is contrary to the Constitution, laws and policy of the State, in that it seeks indirectly to fasten upon the city an interest-bearing indebtedness; also in expressly providing for the payment of interest by the city upon failure to pay water rental. Const., art. 12, sec. 4; art. 16, sec. 1. The council could not contract, directly or indirectly, to pay interest. It could not do indirectly that which is forbidden. Smith, Mun. Corp. § .535; 56 Pac. 29; 13 Ark. 752; Dillon, Mun. Corp. § § 329, 330; 144 U. S. 179; McQuillin, Mun. Ord. § 62; 46 Fed. 899. Authority to pass ordinance is limited to such as are consistent with the

laws of the State, and one that conflicts with the laws or policy of the State is void. Kirby's Digest, § 5460; Smith, Mun. Corp. § 521 and note; Dillon, Mun. Corp. (4 Ed.), § § 319-329; 160 N. Y. 144. An ordinance is unlawful which seeks to take away from the city council authority to change the rates from time to time. Kirby's Digest, § § 5445-5447. Likewise an ordinance which appropriates all the revenues of the city for years in advance of its levy and collection. Const., art. 16, § § 10, 11 and 12; 63 Ark. 397; 52 Ill. App. 581. A city council can not lawfully delegate its authority to a board of arbitration. 66 Ia. 249; 78 Ill. 405; 106 Ill. 430; Smith, Mun. Corp. § § 531, 535, 739; McQuillin, Mun. Ord. § § 458, 716; 150 U. S. 182.

3. The terms of the ordinance are unjust, unreasonable and oppressive, in that it grants the water company an exclusive franchise for an unreasonable length of time, and provides for an indefinite extension at the end of that time.

4. Also because it seeks to bind the city for the payment of hydrant rental at a fixed price for an unreasonable length of time. Smith, Mun. Corp. 739; 65 S. W. 943; 61 Ill. App. 199; 67 Tex. 532; 47 Ill. App. 411; 52 Ill. App. 577.

5. Also as to the condition upon which an extension of the main will be made.

6. Also because the city is at the mercy of the water company as to the amount of water to be supplied.

7. Also because it does not require pure, clear or wholesome water to be furnished.

8. Also because it reduces the pressure required under the former ordinance, and gives no guaranty of fire protection to the University building.

9. Also because it appropriates all the city's revenue for years to come for water purposes only. Such an ordinance is void as a matter of law. *Ubi supra;* 26 S. W. 1029; 6 Mont. 502; 34 Ark. 607; 54 Ark. 645; 52 Ark. 545.

10. Also because it is oppressive upon a particular industry. McQuillin, Mun. Ord. 227 and note; 78 Ill. 405.

11. Also because it authorizes the water company to mortgage its plant for an amount not determined by the value of the plant, and requires the city, as the only means of freeing itself from this ordinance, to pay off this bonded indebtedness. 34

Fed. 208; 70 Fed. 29; 95 U. S. 375; 132 U. S. 107; 170 U. S. 593; Dillon, Mun, Corp. (4 Ed.), § 458; Smith, Mun. Corp. § 739.

12. Also because it fixes a minimum charge for water tor twenty years. 58 Ark. 407; 110 U. S. 347. See, also, Kirby's Digest § 442; 65 S. W. 943.

13. Also because it provides no means whereby the obligations of the water company can be enforced. If the council, having power over the subject-matter, exercise that power in an unreasonable manner, the ordinance is void. 3 Ark. 110; 33 Am. Rep. 239; 52 Col. 606; 162 Ill. 505; 158 Ill. 653.

14. Also because it provides for renewal by arbitration.

15. The ordinance is void for uncertainty. 32 Ill. 100; 162 Ill. 505; 159 Ill. 633; McQuillin, Mun. Corp. § 20 and note; Smith, Mun. Corp. 528 and note.

16. It is illegal because it contracts for the building of a dam in White River where no right of way had been obtained. 58 Minn. 81.

17. It is void because it was not signed by the presiding officer. Kirby's Digest, § 5473; Smith, Mun. Corp. § 739; 118 Cal. 593; 111 Ia. 105; 65 Minn. 419; 17 S. W. 643; 28 Atl. 381; 76 N. Y. 160; 51 Atl. 762. Signing the ordinance is mandatory. 40 Ark. 105. Mere approval on the council journal is not sufficient, but the ordinance itself must be signed, in writing, and its approval can not be left to parol proof. 88 Mich. 268; McQuillin, Mun. Ord. § 101; 10 Atl. 162.

18. The court, having found that material parts of the ordinance were void, should have held it to be void *in toto.* No vested rights had accrued under the ordinance. Equity will not reconstruct a contract, eliminating unlawful provisions, and enforce it as to the remainder where the situation of the parties has not been altered. 88 Am. St. Rep. 969; 150 U. S. 182; 35 La. 548; 153 Ind. 567; 62 Fed. 882; 39 Fed. 353; 102 Fed. 417; 141 U. S. 67; 26 S. W. 1025.

*E. S. McDaniel* and *Walker & Walker,* for appellee.

1. In the light of the presumption that the members of the council have acted from honest motives, and of the positive testimony that no improper influences were brought to bear upon

them, the charges of fraud and undue influence fall to the ground.

2. The passage of ordinances by a municipal body is a matter which is within the discretion of such a body, and the exercise of that discretion in good faith is conclusive, and, in the absence of fraud, will not be disturbed. High on Injunctions, § 1240. While it is true that a city council in discharging a public trust are held to a stricter account than an ordinary agent, yet their contracts will only be set aside where they transcend their authority or are guilty of an abuse of their powers. 49 Am. Rep. 416.

3. Notwithstanding the ordinance grants the exclusive privilege to this company of supplying the city and its inhabitants with water, and agrees that such privilege will be granted to no other person or corporation, yet it nowhere in express terms contracts that the city will not construct and operate a system of waterworks for itself; and no such agreement can be created by implication or construction from the terms of the ordinance. 13 Wall. 68; 191 U. S. 150; *Knoxville Water Company* v. *Knoxville,* 200 U. S. 22.

4. The presumption is that the city will provide for the payment of hydrant rentals, and the provision for the payment of interest on money not paid when due under the contract is not in conflict with the Constitution. 49 Am. Rep. 418; 1 Smith, Mun. Corp. § 738.

5. The objections of appellants as to the rates fixed by the ordinance are not sustained by the evidence. Moreover the consumers are fully protected by the statute. Kirby's Digest, § 5445; 178 Ill. 299; 187 Ill. 571.

6. In view of the great expense incident to the extension of the water system to meet the demands and requirements of the public, an extension of the franchise for only nine years beyond the original term is not unreasonable. 102 Fed. 665; 199 U. S. 317.

7. Partial invalidity of an ordinance does not render the whole ordinance void. "When a part of an act, or if a section of an act, is unconstitutional, that part will be considered as stricken out, and the constitutional part will be maintained, if it can be separated from the unconstitutional part and stand with-

cut it." 37 Ark. 356; 48 Ark. 370; 53 Ark. 490; 46 Ark. 312; 56 Ark. 331.

WOOD, J., (after stating the facts.)   First.   The passage of the ordinances in question was within the express powers of the. city council.  Secs. 5442, 5448, Kirby's Digest.  The ordinances, when passed and accepted by the water company, became contracts, and binding on the parties thereto.   Smith, Mun. Corp. § § 532, 1396.   While the members of the council are trustees for the people of the municipality they represent, and as public agents are held to a stricter account than a mere private agent, yet when they act within the scope of their authority, and make contracts which they are expressly authorized to make, these contracts must be governed by the same rules as other contracts.   They can not be set aside upon other and different principles than those that control other contracts.  *Huidekoper's Lessee* v. *Douglass,* 3 Cranch, 1-70; 1 Rose, notes and authorities cited; *Illinois Trust & Savings Bank* v. *City of Arkansas City,* 76 Fed. 271, 34 L. R. A. 518, and many authorities there cited; *Little Falls Electric & Water Company* v. *City of Little Falls,* 102 Fed. 663; *Jewitt* v. *Town of Alton,* 7 N. H. 257; *Western Sav. Society* v. *Philadelphia,* 31 Pa. St. 175: *Prather* v. *New Orleans,* 24 La. Ann. 41; *Davenport Gas Co.* v. *Davenport,* 13 Iowa, 233.

In the passing of an ordinance contracting for the supply of water to the city, the council must have in mind the interest of the public it represents; and if the ordinance upon its face is so unreasonable and oppressive as to indicate that it was passed solely in the interest of the grantee of the franchise, it will be set aside.   In fixing the terms of such an ordinance the council is acting in a proprietary and ministerial or business capacity, rather than legislative; and while the courts will not interfere to control its discretion to determine whether waterworks are necessary, and its discretion as to whether or not it will grant the franchise to private individuals to furnish same, which is a legislative discretion, they will interfere to inquire whether the contract by its terms is so unreasonable and oppressive as to indicate that the council has transcended its authority and abused its powers in ignoring the rights of the people of the municipality affected by

the contract. *Valparaiso* v. *Gardner*, 49 Am. Rep. 416. Such a contract would be a fraud upon the taxpayers affected thereby, whether the council were guilty of any intentional fraud or not.

The courts will also inquire as to whether there has been actual or intentional fraud in the making of such contracts. The proof does not show any actual or intentional fraud upon the part of the city council, or any member thereof, in making this contract with the appellee. Nor was there any fraud, or undue influence which would be equivalent to it, upon the part of McIlroy in relation to the passage of the ordinances. The various things which appellant alleges that McIlroy said and did, conceding that they are established by the proof, fall far short of constituting fraud or undue influence. Appellants make the mistake all the way in treating McIlroy as if he occupied some superior and controlling position over the aldermen of the city that would enable him to impose upon them, or to exert some undue influence upon them. Nothing is brought forward to establish this, except frequent interviews "on the curb stone, in the streets, behind the corners of buildings and in stairways." But these do not constitute that undue influence that will avoid a contract. McIlroy was not the guardian of the aldermen. They were trusted public servants, and are presumed to be fitted, morally and intellectually, for their responsible duties. Surely they were not mere puppets to be moved only by the will of McIlroy. They were dealing at arms' length with him. McIlroy had the right to talk with them as much as he pleased about the passage of the ordinances in which he was so vitally interested, and to make the best contract with them he could. They were supposed to be able to take care of the city's side of the case. The law must so treat them. No charge of corruption on the part of the aldermen or McIlroy is made, and none is shown. On the contrary, the testimony of the aldermen shows that McIlroy did not attempt to improperly influence them to vote in favor of the ordinances. McIlroy had the right to employ counsel for himself, and he had the right to say to the other side that he did not think it needed any counsel. He was not responsible for the failure of the city council to get all the help it could and all the information it wanted. Appellants can not say that McIlroy made misrepresentations, and was guilty of conceal-

ments that induced them to pass the ordinances. McIlroy is not to be censured, nor to lose any of his legal rights, because he had prepared a draft of the ordinances and submitted it to the council. It was for the council to adopt or reject them as they saw proper. When they passed them, they adopted them, and *it was the work of their hands, not of McIlroy's.* The burden of proof was upon the appellants to sustain the charge of fraud and undue influence, and this is not done by fragmentary acts and desultory conversations that might as well be attributed to innocent as evil motive. But to review in detail the evidence upon which appellants rely to show fraud and undue influence would unnecessarily lengthen this opinion. It is all of a kind. It shows acts upon the part of the council, its attorney, its members, committees or citizens, for which McIlroy is in nowise responsible. And it shows acts · upon the part of McIlroy that do not offend legitimate business methods. We are therefore of the opinion that the charge of fraud and undue influence is not sustained.

Second. *Are the ordinances contrary to the Constitution, the laws, and policy of the State?* Section 12 of ordinance 135 provides that the city "shall have the right to purchase said water works at the expiration of ten, fourteen, and eighteen years at the fair and reasonable price thereof, subject to any *bona fide* indebtedness that may exist thereon." By section 13 authority is given the water company to incumber "the works by a mortgage or otherwise, and it is provided that the money due from the city to the water company for hydrant rental shall be retained by the city treasurer as net earnings of the water company, and shall be held by him in trust for the payment of the rental of the indebtedness of the water company." It is also stipulated in this section that, should the city fail to pay its water rentals when due, the deferred payments shall bear eight per cent. annual interest. It is contended that these provisions are in violation of the Constitution prohibiting cities from issuing interest-bearing evidences of indebtedness, etc. Const., art. 16, § 1. But the provisions named are susceptible of no such construction. The city is not compelled to purchase the water plant. It may do so, if it desires. In case it should, inasmuch as its purchase would be subject to any *bona fide* existing indebtedness to a limited amount, it has provided that such indebtedness should not be unnecessarily

increased by accumulations of unpaid interest. In other words, it has provided a method of requiring the water company to pay its interest. The ordinances, as construed by the chancellor, limit the *bona fide* indebtedness which the water company may incur at an amount not exceeding $1,250 for each hydrant erected and such additional ones as the city might order. Were the city compelled to purchase at an amount limited by the ordinance, but bearing interest, there would be more plausibility in appellant's contention, but such is not the case. The contract on the part of the city to pay interest on the amount for hydrant rentals, in case same was not paid when due, is not issuing interest-bearing evidences of indebtedness. See Smith, Mun. Corp. § 738; *City of Valparaiso* v. *Gardner, supra.* It is not to be presumed or assumed that the city will not meet its obligations when due.

It is contended that the ordinances contravened sections 5445-5447 of Kirby's Digest, "in that they attempted to tie the hands of future councils by fixing the rates to be paid by the city and a minimum rate to be paid by the consumers for twenty years in the future, and contracts for a renewal in the event the city did not buy."

The ordinances fix the rate of hydrant rentals to the city for twenty years and the minimum charge to consumers, but we find nothing in the ordinances fixing the minimum charge to consumers for any specified time. Sections 5445 to 5447 of Kirby's Digest authorize the city council, upon the complaint of five or more citizens of the town that the water company "is charging an exorbitant rate for the supply of water," to make investigation; and if they find that *"the citizens,* or any number thereof, are being charged an unreasonable price for water," it shall be their duty to fix a reasonable price, and the water company is required "to adopt such rates." These sections embody the provisions of an act passed April 21, 1903. Ordinance 135 was passed October 26, 1903, and ordinance 137 was passed after that. If there were any conflicts between the provisions of the ordinances and the statute, of course the statute would prevail, as the requirements of the statute must be read into every contract entered into after its enactment. *Western Sav. Society* v. *Philadelphia, supra.* But we fail to see any conflicts. There is no inhibition on fixing a rate that the city shall pay for its hydrants. There

is no proof in the record that the rates fixed by the ordinances are exorbitant; but if they were, the matter is entirely within the control of the council, under the plain provisions of the statute. See *City of Carlyle* v. *Carlyle Water, L. & P. Co.*, 31 Ill. App. 325.

In *Danville* v. *Danville Water Company*, 178 Illinois, 299, in which is a statute similar to the one under consideration, it was held that although a city has been empowered by statute to authorize a private corporation to construct waterworks and to contract for a supply of water for a period not to exceed thirty years, a subsequent statute empowering any city in which a private corporation has been or may be authorized to supply water for public use, to fix reasonable water rates, is constitutional, and an ordinance passed under a later statute reducing existing water rates, and fixing them at a reasonable price, is valid, although the city enacting it has, under the earlier statute, attempted by ordinance to fix water rates at certain figures for the unexpired term of thirty years. See also *Rogers Park Water Co.* v. *Fergus*, 178 Ill. 571.

The contention that the ordinances "appropriated all of the revenue of the city for years to come in advance of its levy and collection" is not sustained by the proof. True, the proof tends to show that the amount contracted to be paid for hydrant rentals, *in connection with the other expenses* which the city had incurred, would absorb all the revenues at the time the contract was made. But there was no proof, and could be none, of what the revenues of the city would be in the future. No one could tell, of course, with certainty what its wealth and population would be, and what would be its sources of revenue. It had grown rapidly in the past, and might continue to do so. We see nothing in the ordinance in conflict with art. 16, § § 10, 11, 12 of the Constitution. A contract by the city with the water company to pay a stipulated amount for hydrant rentals is not an appropriation of the revenue by the city, in advance of that levied and collected. It is simply a contract to pay, and not an appropriation of specific funds to the purpose. Moreover, the amount agreed to be paid for hydrant rentals was not an amount equal to all the revenues of the city.

Third. In assignments numbered from three to nineteen,

80—9

inclusive, learned counsel, in their able and exhaustive brief, urge that the ordinances are unjust, unreasonable and oppressive, and that for these and various other reasons they are void. We will treat these as numbered, and in the order named in appellant's brief:

3. The appellee had about eleven years of unexpired term to operate its system under the Rees contract when ordinance 135 was passed. That ordinance granted a franchise for twenty years, beginning from the day of its passage. So in reality it was an extension of the franchise for only about nine years. But the power to determine how long such privileges shall be exercised is a discretion lodged in the city council, or governing boards, which some courts have been unwilling to disturb under grants of thirty or even fifty years. *Little Falls Electric Co.* v. *City,* 102 Fed. 665; *California Reduction Co.* v. *Sanitary Works,* 199 U. S. 317.

4. There is nothing in the face of the ordinances, or in the extraneous proof, to show that the amount agreed to be paid as rental per annum for hydrants was unreasonable. We could not determine, without some evidence upon the subject, what hydrants should rent for in a city of the population of Fayetteville, under a system of waterworks such as has been installed there. The presumption is that the council did its duty, and investigated to determine what would be the reasonable value of such rental before fixing the amount. The length of time, as we have shown, was in the discretion of the council primarily, and no abuse of such discretion has been proved.

5. Appellants contend that the condition for the extension of the mains under the ordinances in controversy is unreasonable, and say that under the old (Rees) ordinance extensions could have been compelled without expense to the city. The proof showed that it cost about $50 to put in a fire hydrant. Prior to McIlroy's purchase, a proposition had been made to the city by Rees for certain extensions, upon condition that the city locate a hydrant every 450 feet and pay not exceeding $75 each for putting in the hydrants. This proposition had been accepted by the city. Under the Rees contract extensions could have been compelled, but only where there was "an average of one consumer to every 100 feet of pipes." While the hydrants were only to be

put in when ordered by resolution of the city council, they were to cost not exceeding $75 each, and the city was to pay an annual rent therefor of $35. Had the extension been made under the Rees ordinance and the proposition for extension which Rees had made and the city had accepted, the additional hydrants might have cost the city $75 each, and the hydrant rental would have been the same as it is under the ordinances in controversy. It is clear from this that the city council either did not consider that extensions could be compelled under the Rees contract without expense to the city, or else they concluded that it would be unjust to have extensions made without ordering and paying for hydrants. There is no complaint or showing that this contract with Rees was unreasonable or oppressive. *A priori,* would the contract with appellee for the extension of mains not be unreasonable and oppressive, for, under it, the city was to secure eighteen additional hydrants, without any charge for furnishing or placing same, thus saving the city in this particular $1,350. The extension could have been compelled under the contract with appellee, as well as under the contract with Rees. The purpose of both was to supply "with water the streets, lanes, alleys, squares and public places" in the City of Fayetteville. But the extension could only be compelled upon the terms of the contracts, which were the same in the particular of requiring an extension only where there was "an average of at least one consumer to every 100 feet of pipes." This was not an unreasonable requirement. It was expensive to extend the water system, and the water company could not be expected or required to do so where there was no prospect for reasonable remuneration. If the amount the consumers had to pay was found to be unreasonable, they have their remedy under the statute, as we have shown. But the court held this part of the ordinance void, and we need not consider it further. The council under the Rees ordinance thought it proper to require the city to locate a hydrant for every 450 feet of main and to pay therefor not exceeding $75 per hydrant. The contract with appellee for the extension of mains is more favorable than that. Since the hydrants cost $50 each, we do not consider that a profit of $25 each to appellee for furnishing and placing same would be exorbitant; at least not so much so as to avoid the contract.

6 and 7. The contract for main extension was not unreasonable. The city is amply protected under the various provisions of the ordinances for its water supply, both as to quantity and quality. Appellee contracted on his part, in consideration of the "rights, privileges and franchises" granted it by the city, to supply "with water the streets, lanes, alleys, squares and public places in the city of Fayetteville," and to "enlarge the capacity of the waterworks plant to such an extent" as "is necessary to meet the growing demands of said city for such water supply." Appellee has the exclusive right to supply water for "extinguishing fires in said city," and "for domestic, manufacturing or industrial uses." These are the uses named; others would be implied if necessary to give the city water, for that was the evident and expressed purpose of the contract. The "water shall be supplied from West Fork of White River, and be of the purest quality obtainable, either directly from the stream or from wells adjacent thereto, or from any source from which the said company may desire to procure same, except from below the mouth of the town branch." The terms of the ordinances carefully and specifically provide that the pipes shall be large enough and the pressure great enough to supply water for "all domestic, manufacturing and industrial uses in every part of the city" where appellee under the terms of the ordinance could be compelled to extend its pipes.

Said ordinances provided in the way of fire protection the following:

"Sec. 17. The said water company, its successors and assigns, are to supply and maintain sufficient pressure to discharge through fifty feet of two and a half (2½) inch hose, one (1) inch smooth-bore nozzle, four streams simultaneously to a height of sixty-five (65) feet on the public square from the four hydrants located thereon; and sufficient to discharge through a like hose and nozzle from a hydrant to be located by the city council on Dickson Street, at a point south of the University, a stream to the height of sixty-five (65) feet. Said water company further agrees, after receiving forty-five minutes' notice given by the chief of the fire department of said city to its engineer at its pumping station, and upon the opening and closing by said fire department, or by the agents of said water company of the necessary valves

at the reservoir, to give direct pressure from the pumping station (provided the opening and closing of said valves be required to furnish sufficient pressure to throw three streams simultaneously on the public square through such hose and nozzle to a height of seventy (70) feet, or two streams to a height of eighty (80) feet, or one stream at said hydrant south of the University to a height of seventy-five (75) feet."

Section 11 is as follows:

"Sec. 11. For the full term of twenty (20) years provided for in this contract, the said Fayetteville Water Company, its successors and assigns, shall continue and furnish without default a constant and uninterrupted supply of water to said city for the various uses as hereinbefore set forth, provided if at any time the supply of water shall cease or make default from any cause of neglect on the part of said Fayetteville Water Company, its successors and assigns, for five days at any time, then the city may take charge temporarily of said works, machinery and appliances, and operate the same until by sureties or otherwise said works will be efficiently operated and the expense incurred by said city in operating the same shall be a lien upon the earnings of said works until paid. In case the water company fails to supply water, then all hydrant rentals shall cease until such time as the same is supplied."

Under these provisions, the apprehension that the city will be "at the mercy of the water company for all time as to the amount of water to be supplied" is groundless. Likewise the fear that the contract does not require "pure, clear or wholesome water to be furnished."

The contract calls for the "purest water obtainable," and for a bountiful supply; and if the water company neglects to comply with its contract for five days, its property under section 11 is practically confiscated to the city during the time of such neglect. This is the remedy provided by the contract itself for its enforcement, and it is cogent. But if there were a substantial and continued breach of contract in this or any other respect, the city would have the usual remedy in a court of chancery.

8. The proof tends strongly to show that better protection of the University Buildings from fire than had obtained under the Rees ordinance was one of the objects in contemplation of both

parties in the passage of the ordinances in controversy. If it shall be demonstrated that the contract fails to carry out one of the purposes that the parties had in view, to give protection from fire to the University buildings, it will be time enough then to seek to set aside the contract on that ground. There is no proof in this record showing that the waterworks system when fully installed, as contemplated by the contract with appellee, will not afford ample protection to the University buildings. No tests have been made, and no proof offered, showing to what height water can be thrown under the improvements to be made by appellee.

9. The ninth assignment has been disposed of under another head.

10. The chancery court held with appellants on the objection raised in this assignment, and the water company has not appealed.

11. The chancery court enjoined the water company from mortgaging or bonding its plant for more than $1,250 per hydrant. The appellee has not appealed from this. So, under the decree of the court, the *bona fide* bonded indebtedness of the water company can not exceed $1,250 for each hydrant. It may be less. Learned counsel for appellants argue that the contract is unjust and oppressive, and that, unless it is declared void, the only way the city can secure relief is to purchase for the full value of the property, subject to any indebtedness that the water company may have bonded the plant for. If the city were required absolutely to purchase the waterworks, after a stated period, for its full value, and subject to an unlimited indebtedness, or even to an indebtedness equal to $1,250 for each hydrant the city might order, the contract would probably be unreasonable, as showing a disposition upon the part of the city council to allow the waterworks an exorbitant profit, and thus to ignore the rights of the city. But such is not the case. As we have shown, the city is not required to purchase at all, but has the option to do so, in ten, fourteen and eighteen years. If the city should not desire or be in condition to purchase, it is but just to the company that its franchise be extended for a reasonable time, for otherwise its property would be valueless and confiscate.

We do not agree with the counsel that the contract giving

the city the option to purchase, or else binding it to extend the franchise, places an unreasonable burden upon the city which it can only remove by purchase of the property. The contract is comprehensive enough in its general scope, and yet specific enough in details, to assure the city an excellent water supply. But, if it is found by actual experience that the contract was an improvident one, the city is not "left at the mercy" of the appellee "for all time," as counsel assert, for its water supply. In case the city does not exercise its option to purchase, it is only required to extend the franchise "on fair and reasonable terms." Again, while the language of the contract to the effect that the appellee "shall have the exclusive right to maintain and operate waterworks," etc., is doubtless sufficient to inhibit the city from granting the privilege to any other corporation, company or individual, we doubt whether it is sufficient to prevent the city from maintaining its own water plant. "It is," says the Supreme Court of the United States, "important that the court should adhere firmly to the salutary doctrine underlying the whole law of municipal corporations and the doctrine of the adjudged cases, that grants of special privileges affecting the general interest are to be liberally construed in favor of the public, and that no public body, charged with public duties, be held upon mere implication or presumption to have divested itself of its powers." See also *Joplin v. S. M. Light Co.*, 191 U. S. 150; *Stein v. B. Water Co.*, 141 U. S. 67. These authorities at least leave it an open question, and we need not, and do not, decide it, for we are of the opinion that the ordinances are valid, regardless of whether or not the city could own and maintain its own water plant.

12, 13 and 14 have been disposed of in what we have already said.

15. The court held that those provisions of the ordinances allowing arbitrators, in case of disagreement by the parties, to fix the value of the waterworks plant, and to stipulate the terms of extension, were void. Therefore appellants can not complain.

16. The contention that the ordinances are void on account of ambiguities of expression in certain sections of the contract is not well taken. The meaning of these terms and sections is easily discoverable from the context, and can readily be made certain when considered in connection with other parts of the

contract and the subject-matter thereof. The rule of *"id certum est quod certum reddi potest,"* would apply to the uncertainties of which appellants complain, and the contract should not be avoided on account of these.

17. The contract requires the appellee "to construct and maintain a dam four or five feet high at the river near pumping station for impounding water." It is contended that no right of way had been obtained, and that this provision would result in flooding farms for which the city would be liable. The securing territory for the dam, and the damages that might result to property owners by reason of its construction, are matters that do not concern the city under the contract. The city could not be held responsible in any way for the failure of the appellee to carry cut its contract in this respect with the city, nor could the city be held liable for any damages to third parties caused by the performance of the contract by appellee. These are questions for the appellee to settle, not the city. Not until appellee fails or refuses to comply with its contract in these particulars can the contract be avoided for that reason. It suffices that the question is not for decision now.

18. It is contended that ordinance 137, which is brought in question by the supplemental complaint, is void for the reason "that it was not signed by the presiding officer." The record of the passing of this ordinance is as follows: "Regular meeting of the city council, November 9, 1903; present J. T. Eason, Mayor, Fred Jones, Recorder. Aldermen, Atha, Chapman, Hansard, Hight, Phillips, Conner. After which said ordinance was by Fred Jones, acting mayor, (J. T. Eason, Mayor, having been excused on account of sickness) declared adopted and finally passed. Said ordinance as amended and finally passed and adopted is as follows:" (Here follows ordinance.)

"There being no further business, on motion of Chapman, seconded by Hansard, council adjourned.

"Fred Jones, Acting Mayor; C. O. Hansard, Acting Recorder."

The statute provides: "All by-laws or ordinances shall, as soon as may be after their passage, be recorded in a book kept for that purpose, and be authorized by the signature of the presiding officer of the council and the clerk." Sec. 5473, Kirby's

Digest. The record shows a compliance with the statute as to authentication. Jones was the presiding officer at the time of the passage of the ordinance, and Hansard was the acting clerk or recorder. They signed the record containing the ordinances. But the proof shows that ordinance 137 was passed because it was feared that 135 had not been passed, and 137 was intended as a substitute for 135, in the event 135 had not been legally passed. The proof shows that ordinance 135 was legally passed. Indeed, the complaint and the contention of appellants all the way are bottomed on the fact that the ordinances were passed. Assuming and alleging that they were passed, appellants seek to set them aside for the various reasons set up in the complaint.

19. It is not the law that "if the ordinance was void in part, it was void *in toto.*" Judge Dillon says: "If part of a by-law be void, another essential and connected part of the same by-law is also void. But it must be essential and connected to have this effect." 1 Dillon, Mun. Corp. § 421; 1 Smith, Mun. Corp. § 542. This is the well-settled doctrine, and has been more than once announced by this court. *Rau* v. *Little Rock,* 34 Ark. 303; *Eureka Springs* v. *O'Neal,* 56 Ark. 350. See also *State* v. *Marsh,* 37 Ark. 356; *Little Rock & F. S. Ry. Co.* v. *Worthen,* 46 Ark. 312; *State* v. *Deschamp,* 53 Ark. 490; *Leep* v. *Ry.,* 58 Ark. 407; Ex parte *Deeds,* 75 Ark. 542. It should be remarked that in the cases in our own court recognizing the principle, the ordinance or act under review was an expression of the will of the State or municipality in its govermental, rather than proprietary or business, capacity. But we do not see why there should be any distinction as to the parts of acts or ordinances that are prejudicial to the interest of the State or city, and that were no part of the consideration or inducement for the contract, so far as the State or municipality is concerned, but were engrafted solely for the benefit of the other party to the contract. So long as the party for whose benefit these provisions were made is not complaining, the other side should not be heard to complain if such provisions are removed. The parts of the ordinance which the lower court declared void were easily severable and made independent of the other portions, declared valid, and there can be no doubt that the city council would have passed the ordinance with these portions omitted, for they conserved the interest of

the appellee, and not the city and its inhabitants and taxpayers. Appellee does not complain of the ruling of the court in canceling these provisions, and appellants should not.

20.    The adjustment of costs was largely in the discretion of the lower court. The chancellor doubtless concluded that appellants obtained no substantial relief, inasmuch as the avowed object of the litigation, the cancellation of the contract, was decided in appellee's favor; and, as we find no error in this ruling, the judgment of the court will be in all things affirmed.