35 So.2d 752

**HOTARD et al. v. CITY OF NEW ORLEANS et al.**

Nos. 38817, 38833, 38888, 38896.

March 22, 1948.

Rehearing Denied April 26, 1948.

Edward Rightor, Willis C. McDonald and Robt. J. Lacey, Jr., all of New Orleans, for plaintiffs-intervenors, the Police Jury for the Parish of Jefferson and the Council of Affiliated Railroad Crafts, appellants.

Gordon B. Hyde, of New Orleans, for August B. Schmidt, Sr., intervenor.

Henry G. McCall, City Atty., Henry B. Curtis, Asst. City Atty., Lemle, Moreno & Lemle, Louis G. Lemle, Chaffe, McCall, Bruns, Toler & Phillips, Harry McCall, Dufour, St. Paul & Levy, Leonard B. Levy, Milling, Godchaux, Saal & Milling, R. E. Milling, Jr., John C. Foster, Monroe & Lemann, J. Blanc Monroe and Walter J. Suthon, Jr., all of New Orleans, Wood, King & Dawson and David M. Wood, all of New York City, for defendants-appellees.

O'NIELL, Chief Justice.

Two taxpayers residing in New Orleans brought this suit against the city and certain railroad companies to have the court declare invalid a constitutional amendment, which was proposed by Act No. 385 of 1938 and which became Section 31.3 of Article 14 of the Constitution, authorizing the city, acting through the Public Belt Railroad Commission, to construct, maintain and operate one or more railroad passenger stations in New Orleans and as an incident thereto to eliminate certain grade crossings. The plaintiffs sued also to annul a contract made by the city with the defendant railroad companies under authority of the constitutional amendment, and to prevent by injunction the carrying out of the contract. Several other taxpayers and the Police Jury of Jefferson Parish intervened in the suit taking the side of the plaintiffs. The district judge after hearing the case gave judgment for the defendants rejecting the demands of the plaintiffs and interveners and dismissing the suit. The plaintiffs and some of the interveners have appealed from the decision.

The argument for the appellants resolves itself into two main divisions: (1) an attack upon the validity of the constitutional amendment, and (2) an attack upon certain provisions of the contract itself.

The first complaint concerning the validity of the constitutional amendment is that it really consists of several amendments

and therefore should have been so submitted as to enable the electors to vote on each amendment separately, as provided in Section 1 of Article 21 of the Constitution. In support of this complaint the appellants cite and rely upon Graham v. Jones, 198 La. 507, 3 So.2d 761.

The constitutional amendment in question is really only one amendment, authorizing the city to establish and maintain one or more railroad passenger stations, and, as an incident thereto, to eliminate certain grade crossings of tracks entering the station or stations. This new section—31.3 of Article 14—is necessarily a long section because it embodies all of the details concerning the authority which was conferred upon the city. It covers nearly five pages of the Constitution; but all of its provisions relate to the one purpose of authorizing the city, acting through the Public Belt Railroad Commission, to construct, maintain and operate one or more passenger stations, and, as an incident thereto, to eliminate grade crossings. The provisions of the amendment are so interrelated that it would not have been feasible to submit each one of them to the voters as a separate and independent amendment of the Constitution. If they had been so submitted, and if the voters had voted for some of the propositions and against others, the purpose of the amendment might have been defeated. In fact, a careful reading of the amendment reveals that it would have been practically if not

actually impossible for the voters to vote upon the adoption or rejection of each provision separately. All that the Constitution—Section 1 of Article 21—requires in that respect is that when more than one amendment shall be submitted at the same election they shall be so submitted as to enable the electors to vote on each amendment separately. That provision was complied with literally in this instance, in Act No. 385 of 1938, proposing the amendment, which provided in Section 3 that on the official ballot to be used at the election there should be printed:

"FOR the proposed amendment to the Louisiana Constitution authorizing a union station or stations at New Orleans".

and also

"AGAINST the proposed amendment to the Louisiana Constitution authorizing a union station or stations at New Orleans".

In the same section it was provided that each elector voting on the provision for so amending the Constitution should indicate his vote in the manner provided by the general election laws of the state. In compliance with the statute, the two paragraphs were printed separately on each ballot—thus:

"FOR the proposed amendment to the Louisiana Constitution authorizing a union station or stations at New Orleans.

"AGAINST the proposed amendment to the Louisiana Constitution authorizing a union station or stations at New Orleans".

Opposite each of these paragraphs was the white square, for each voter to indicate his vote, by stamping the ballot in the manner provided by the general election laws of the state.

The decision in Graham v. Jones is not at all appropriate to the complaint made in this case. In the case cited it was found by a majority of the members of the court that the constitutional amendment really consisted of several separate and distinct amendments of several sections of the Constitution. That is not true in this case because all of the provisions of the one amendment in this case relate to the main purpose of establishing and maintaining and operating one or more railroad passenger stations, with all approaches thereto and appurtenances thereof. As we have pointed out it would have been impractical if not impossible to submit the several provisions of this amendment so that the voters could vote intelligently and effectually upon each provision separately.

■ The second ground of attack upon the validity of the constitutional amendment is that the voters were not properly notified or informed of the contents or provisions of the amendment. All that the Constitution—Section 1 of Article 21—requires in that respect is that the Secretary of State shall cause the proposed amendment to be published in a newspaper in each parish in which a newspaper is published, twice within not less than 30 days nor more than 60 days preceding the

election at which the amendment is to be submitted to the voters. It is admitted that the Secretary of State did cause this amendment to be published in full in one newspaper in every parish in the state, twice within not less than 30 nor more than 60 days preceding the election at which the amendment was voted upon. It appears in some of the briefs for the appellants— and was revealed in their oral arguments— that they have confused the manner of submitting constitutional amendments on the printed ballots with the manner in which notice shall be given by publication in the newspapers. The publication in the newspapers gives the voters full information as to the contents or provisions of a proposed constitutional amendment. All that is required to be printed on the ballot is sufficient information to identify the proposed amendment which the voter is voting for or against. In this case it is not contended that the wording of the submission was not sufficient to identify the amendment which the voters were called upon to vote for or against. There is therefore no merit in the argument that the voters were misled or were not sufficiently informed of the contents or provisions of the proposed amendment. The case of Schultz v. Police Jury of Tangipahoa Parish, 196 La. 359, 199 So. 215, cited by the appellants, is not at all appropriate to this case. In the Schultz Case a constitutional amendment, Section 33 of Article 14, authorized the police juries throughout the state to issue bonds to provide funds for the construction

and maintenance of industrial plants for the conversion or processing of raw farm or agricultural products, when authorized by a majority vote of the property taxpayers of the parish, or of any police-jury ward. The police jury of the Parish of Tangipahoa adopted a resolution submitting a proposition to the vote of the property taxpayers, intending that the industrial plant should be used only for the conversion or processing of milk; but there was no indication in the resolution as published, as to what kind of farm or agricultural products were to be processed. It was held therefore that the resolution, as published, did not give the taxpayers sufficient information as to the proposition on which they were called upon to vote. There is no comparison between that case and this case.

The appellants' first attack upon the legality of the contract is upon the following portion of Paragraph L of Section 7 of Article II: "The City hereby further agrees that * * * it shall be the policy of the City to budget and appropriate annually out of its general revenues derived from various sources for general municipal purposes * * * the sum of Five Hundred Thousand Dollars * * * per year * * * to be * * * used * * * for the same purpose for which the proceeds of the bonds referred to in this paragraph are to be * * * dedicated * * *." It is contended that this provision of the contract violates Section

24 of Article XIV of the Louisiana Constitution, which forbids the City of New Orleans to anticipate the collection of any of its taxes, or to incur any debt or obligation unless sufficient funds (not otherwise appropriated) to pay such debt are actually in the city treasury at the time when the debt is incurred. The appellees apparently concede that this provision would be illegal if it, in fact, expresses an obligation on the part of the city to make the annual appropriation referred to. The city's position is that the provision is merely a declaration of the city's intention as to the course of action which it will pursue in the future, but which declaration is in no way binding upon the city. We agree with the contention of the appellees, for two reasons. It is a familiar rule of law that if one of two reasonable constructions of a contract provision will render it valid and the other will render it invalid, the first will be adopted or approved by the court. Sporl v. New York Indemnity Co., 176 La. 363, 145 So. 771. Moreover, there is in the record a stipulation by the attorneys representing all parties to the contract to the effect that the construction contended for by the defendants is that which was intended by the parties. In the absence of any showing to the contrary, we assume that the parties to the contract authorized their attorneys to make that stipulation. Hayes v. Cuny, 9 Mart., O.S., 87; Dangerfield's Executrix v. Thurston's Heirs, 8 Mart., N.S , 232. The appellants refer to

the use of the word "policy" in the constitutional amendment in what they contend is a different sense from that in which the appellees contend it is used in the contract itself. The meaning of the word in the constitutional amendment does not control its meaning in the contract. "The same words may have different meanings in different parts of the same act, and of course words may be used in a statute in a different sense from that in which they are used in the Constitution." Lamar v. United States, 240 U.S. 60, 65, 36 S.Ct. 255, 257, 60 L.Ed. 526. Besides, if the intention of the parties to the contract had been to bind the city absolutely to appropriate the $500,000 annually the obligation would have been expressed more directly and positively than by saying that it would be the policy of the city to make the appropriations.

The appellants attack also that portion of the contract provision stating the policy of the city to appropriate $500,000 annually which provides that the money so appropriated shall be "used * * * for the same purpose for which the proceeds of the bonds [the $12,000,000 bond issue for grade separations] * * * are to be * * * dedicated, *as well as for the payment of the cost of the other obligations and undertakings assumed by the City in this agreement."* The appellants argue that the italicized clause indicates that the city intends to spend or is empowered to spend the appropriated money for

illegal purposes. There is no reason to assume that the city will not act according to law in that respect.

 The appellants attack also certain provisions of the contract which create what they call a "dump fund," which is "to be dedicated and exclusively used for the payment and discharge of the obligations assumed by the City under this agreement." As in the case of the clause discussed in the preceding paragraph, to hold invalid the provisions creating the so-called "dump fund," this court would have to assume that the parties intend to use this fund for an illegal purpose. There is no reason for any such presumption.

 The appellants attack the provision in the contract for submission to arbitration disagreements among the parties to the contract. The appellants contend that Article 459 and 460 of the Code of Practice strike this provision with nullity. We can find nothing in the articles cited which would render invalid the provision in question. The appellants seem to think that if the parties intend to empower the arbitrator to act as an amicable compounder they must so state their intention in so many words. There is no such requirement in Article 460 of the Code of Practice. A municipality has the right to submit disputes to arbitration in the absence of any law to the contrary. Dillon on Municipal Corporations, Section 822; McQuillin on Municipal Corporations, Section 2646. The appellants cite no law which would limit the power of the City of New Orleans to agree to submit disputes to arbitration.

 The appellants assail the legality of Section 85 of the contract, which reads, in part, as follows: "The City hereby determines, pursuant to the power conferred on it under the first paragraph of Section 31.3 of Article XIV of the Constitution of the State of Louisiana * * * and the parties hereto hereby agree that * * * the acquisition, construction, maintenance and operation of the Union Passenger Terminal shall not be governed or controlled by any otherwise applicable provisions of Louisiana Act 271 of 1908, Sections 58 and 60 of Louisiana Act 159 of 1912, Louisiana Act 144 of 1934, Louisiana Act 127 of 1940, Louisiana Act 171 of 1940, and any and all acts amendatory thereof and shall be conducted and accomplished without reference thereto." The appellants contend that this provision is in contravention of Articles 11 and 12 of the Revised Civil Code. The appellees, on the other hand, rely on the opening words of the constitutional amendment which authorizes the construction of the terminal as authorizing the city to stipulate that the statutes named shall not govern the construction of the terminal. These words read as follows: " * * * the City of New Orleans * * * shall have the power, in any manner it may determine, to acquire, construct, maintain and operate one or more railroad passenger stations

* * *." Our opinion is that this general phrase, coupled with the authorization contained in subsection (A) for the city to enter into contracts relating to the construction of the terminal, empowers the city to stipulate for the non-applicability of the statutes referred to. In this connection we must bear in mind that the constitutional amendment authorizes the city "to enter into a contract or contracts, containing such terms, conditions, stipulations and provisions * * * as may be approved by the vote of a majority of all the members of said Commission * * *."

■■■ The appellants complain of the contract provisions which apportion the cost of the grade separation program between the city and the railroads. It is provided that the city shall pay 85 per cent of this cost and that the railroads shall pay 15 per cent. The constitutional amendment gives the city the absolute power to contribute to the cost of the grade separations any amount that the Commission Council may determine. The appellants cite the provision of the charter of the city which empowers the city to require any railroad to contribute 65 per cent of the cost of any grade separation. In answer to this argument, it need only be pointed out that this provision empowers the city so to act, but does not command it so to act. Appellants further argue that this provision must be set aside as an unconscionable or iniquitous abuse of discretion or authority on the part of the city.

Examination of the authorities cited by both sides on this point leads us to the conclusion that the weight of authority is to the effect that the act of a municipality, although it be duly authorized, can be set aside by the judiciary, but that this will be done only if the act is such a manifest and oppressive abuse of authority that it appears that the municipality has entirely ignored the interest of the people whom it represents. McQuillin on Municipal Corporations, Section 378; Lackey v. Fayetteville, 80 Ark. 108, 96 S.W. 622; Rosenthal v. Goldsboro, 149 N.Car. 128, 62 S.E. 905. The mere fact that the act might have been executed in a manner more advantageous to the public interest is immaterial. City of New Orleans v. Warner, 175 U.S. 120, 20 S.Ct. 44, 44 L. Ed. 96; Campbell v. City of New York, 244 N.Y. 317, 155 N.E. 628, 50 A.L.R. 1473.

■■■ The appellants complain of the contract provision which vests in a committee, the majority of the members of which represent the railroads, certain powers relative to the construction of the terminal. The constitutional amendment specifically provides that the city may "vest in a Committee or other body composed of representatives of any and all interested parties, including but not limited to representatives of any railroad company or railroad companies, * * * such powers as may be specified in such contract or resolution for supervising or controlling the acquisition, construction, maintenance

and operation of said passenger station or stations." The action complained of, therefore, has been specifically approved and authorized in advance by the people themselves. The appellants argue vigorously that the city has delegated a part of its police power to this committee. That, if true, is authorized by the constitutional amendment,—the supreme power in the state. The powers delegated are "powers * * * for supervising or controlling the acquisition, construction, maintenance and operation of said passenger station or stations."

▉▉▉ The appellants attack also the provisions of the contract (1) which make payable out of the revenues from the terminal the $15,000,000 of bonds which the city undertakes to issue; (2) which exempt the terminal and the railroads' use thereof from taxation; (3) which postpone the obligation of the railroads to pay rent for the use of the terminal until the $15,000,000 bond issue has matured; and (4) which fix the final maturity date for the $15,000,000 bond issue as January 1, 1998. A sufficient answer to these complaints, is that these provisions are all specifically authorized by the constitutional amendment; hence it is beyond the power of the court to question their legality.

The judgment is affirmed.

PONDER, J., dissents and assigns reasons.

FOURNET, J., dissents and assigns written reasons.

PONDER, Justice (dissenting).

I cannot agree with the conclusion reached in the majority opinion that no obligation is expressed in the contract on the part of the city to make an annual appropriation of $500,000 from year to year to be used for the same purpose for which the proceeds of the bonds are dedicated. Only an excerpt from the provisions relating to this matter in the contract is quoted in the majority opinion. If the excerpt were all that was contained in the contract, the statement in the majority opinion, that the provisions in the contract are merely declarations of the city's intention of the course of action which it will pursue in the future, might be well founded. However, when the entire provisions relating to this subject matter are considered, it is apparent that they express an obligation on the part of the city to make the annual appropriations and provide for the enforcement of such obligation. A mere reading of the entire provisions, relevant thereto, demonstrates these facts. The pertinent provisions reads as follows:

"The City hereby further agrees that, in addition to the segregation, deposit and dedication of the proceeds of the aforesaid bonds, and commencing with the annual budget of the City for the year 1948, and

continuing for as many years as may be necessary to complete the obligations of the City hereunder, it shall be the policy of the City to budget and appropriate annually out of its general revenues derived from various sources for general municipal purposes, other than the taxes for the payment of the principal and interest of the bonds of the City now outstanding or hereafter to be issued pursuant to Act 4 of 1916, or which are otherwise dedicated by law to special purposes, the sum of Five Hundred Thousand Dollars ($500,000.00) per year, which said annual sum so budgeted and appropriated shall likewise be segregated and deposited not later than the next succeeding July first of each year in the aforesaid special depository account or accounts, and which said annual sums so budgeted, appropriated and deposited as aforesaid are to be dedicated and solely and exclusively used, to the extent necessary, for the same purpose for which the proceeds of the bonds referred to in this paragraph are to be segregated, deposited and dedicated, as aforesaid, as well as for the payment of the cost of the other obligations and undertakings assumed by the City in this agreement."

"The City hereby further agrees that it shall be the mandatory duty of the official or officials of the City charged with the duty of collecting the proceeds of the aforesaid bonds when sold, as well as collecting the revenues of said City from which the aforesaid annual appropriations so budgeted

are to be derived, promptly to segregate and deposit the proceeds of said bonds and of said annual appropriations in the manner and by the time stated as hereinabove set forth."

"The City hereby further agrees that it shall likewise be the mandatory duty of the aforesaid official or officials of the City to provide for the furnishing of adequate security for the funds so deposited as aforesaid."

"The City hereby further agrees that the performance by the aforesaid official or officials of the City of the duties imposed upon him or them, in the manner and by the time stated as aforesaid, is hereby declared to be an essential part of the obligations agreed to by the City in this agreement and said performance may be enforced by any party to this agreement, or by the Trustee referred to in this agreement, by appropriate proceedings in any court of competent jurisdiction."

"The City hereby further agrees that all funds deposited in the aforesaid depository account or accounts are to be held inviolate by it, and are to be expended only upon vouchers or checks drawn against the said funds by the Commissioner of Public Finance, or his successor in office, upon the approval of the Commission Council, or its successor as the governing body of the City of New Orleans. Any unused funds in such depository account or accounts from the aforesaid annual appropri-

ations shall, upon the completion of the City's obligations and undertakings under this agreement, be thereupon released and returned to the General Fund of said City."

It is stated in the majority opinion that the appellees apparently concede that the provisions would be illegal if they express an obligation on the part of the city to make the annual appropriations. I am of the opinion that these provisions of the contract violate Section 24 of Article XIV of our Constitution, which forbids the city from anticipating the collection of any of its taxes or incurring any debt or obligation unless sufficient funds, not otherwise appropriated, to pay the debt or obligation are actually in the treasury at the time the debt is incurred. This illegal portion of the contract would vitiate it because we have no authority to rewrite the contract.

For the reasons assigned, I respectfully dissent.

FOURNET, Justice (dissenting).

The City of New Orleans, availing itself of the provisions of the amendment to Article XIV of the Constitution of Louisiana, Section 31.3, adopted pursuant to Act No. 385 of 1938 and acting through the Public Belt Railroad Commission, entered into a contract on October 22, 1947, with the various railroads servicing New Orleans for the construction, use, and maintenance of a union station, its connecting tracks, crossings, yards, freight terminals, and other appurtenances.

The validity of this contract was challenged by two citizens and taxpayers of the city (one, Mr. Theophile O. Hotard, being the city's Commissioner of Public Property), a number of other citizens and taxpayers, as well as the Police Jury of Jefferson Parish, intervening, adopting substantially the same position taken by the plaintiffs.

The challenges which these parties have levelled at the contract's validity may be divided broadly into an attack on (1) the constitutionality of Act No. 385 of 1938, which authorized the submission of this amendment to the people for ratification, and (2) the legality of the contract itself.

The constitutionality of the amendment is questioned on the ground (1) that it was improperly placed before the voters by the inclusion in a single proposal purporting to be nothing more than an approval of the construction of a Union Passenger Terminal at New Orleans of so many other propositions that should have been submitted separately that the voters were misled as to just what they were authorizing by their ratification; (2) it repeals several sections of the constitution by implication; and (3) it authorizes the city to surrender its right of eminent domain to a non-governmental agency.

The grounds that allegedly vitiate the contract itself are that (1) the Public Belt Railroad Commission's authority to administer the terminal facilities has been divested and transferred and delegated to

a committee composed of 6 representatives of the city and 1 representation for each railroad that may use the facilities (at the present time there are 10 such railroads, but the contract is so worded that these railroads may actually be given additional voting power and the present voting ratio of 6 to 10 in favor of the railroads greatly increased after the station is ready for use), and this committee, with the larger delegation from the railroads, is authorized "to take any action which it may deem necessary" with respect to the supervision and control of the acquisition, construction, maintenance, operation, and use of this terminal, including the right to employ or dismiss any and all employees and to fix wages, the Public Belt Railroad Commission being prohibited from interfering in any way; (2) the city has surrendered its police power to this committee; (3) the city is obligated to appropriate $500,000 annually for the maintenance of the terminal facilities out of its general revenue, in contravention of Section 24 of Article XIV of the constitution; (4) the city has by contract dispensed with the applicability of certain acts of the legislature, in violation of Article III of the constitution that vests the right to enact, amend, and repeal laws in the legislature, and of Article VII, wherein the judiciary is vested with the right to determine the applicability of laws; (5) the retirement of the bonds to be issued for the financing of this project has been agreed upon in a manner that contravenes Section 14 of Article XIV of the

Constitution and of Act No. 46 of the Extra Session of 1921; and (6) the city illegally imposed upon the taxpayers the obligation of defraying 85% of the cost of constructing under and overpasses in connection with street and railroad crossings (leaving a mere 15% to be contributed by the railroads), in violation of the provisions of the city charter requiring that such apportionment be on a basis of 65% to the railroads and 35% to the city, in contravention of the public policy of the state requiring the railroads to bear the larger portion of the expense incidental to crossing facilities (the Louisiana Public Service Commission can compel the railroads to pay the entire cost of constructing and maintaining suitable crossings), and in disregard of the jurisprudence of the Supreme Court to the effect that the division of such costs must bear some reasonable relation to the benefits to be received.

These very serious and extremely important issues (as well as the innumerable ramifications into which they subdivide) were disposed of in a most summary manner in the majority opinion, without any discussion of the singularly fundamental legal principles underlying them or of the applicable constitutional provisions and jurisprudence, exhaustively treated in the numerous briefs of the appellants.

There can be no question but that the manner in which this amendment was placed before the voters of the state for ratification was in clear violation of Sec-

tion 1 of Article XXI of the constitution in the light of the holding of this court in the case of Graham v. Jones, 198 La. 507, 3 So.2d 761, 782. In that case the court very aptly pointed out:

"According to Section 1 of article 21 of the Constitution, five elements are indispensable to give validity to a proposed constitutional amendment. They are: The assent of two-thirds of the Legislature, the submission of only one amendment in each proposal, the designation by the Legislature of the date of the election at which the submission shall take place, the publication of the proposed amendment, and a majority of the popular vote. Each of these essentials is as important as the other. In the absence of any one of them, the proposed amendment is without legal effect."

Quoting with approval and at length from the case of Kerby v. Kuhrs, 44 Ariz. 208, 38 P.2d 549, 94 A.L.R. 1502, where the rule is laid down that is to be applied in determining whether one or more constitutional amendments are covered by a proposal, this court in the Graham case held, as set out in the syllabus, that:

"If propositions in proposed amendment to Constitution cover matters necessary to be dealt with in some manner, in order that Constitution, as amended, shall constitute a consistent and workable whole on general topic embraced in part which is amended, and if, logically, propositions should stand or fall as a whole, then but

one amendment is submitted, but, if any proposition, although not directly contradicting others, does not refer to such matters, or *if proposition is not such that voter supporting it would reasonably be expected to support principle of others, then two or more amendments are submitted and proposed amendments falls within constitutional prohibition against submitting more than one amendment in the same proposal without affording voters opportunity to vote on each amendment separately."* (Italics mine.)

When the constitutional amendment proposed by Act No. 385 of 1938 was submitted to the people for ratification, they were simply informed on the ballot that they were either voting for or against "the proposed amendment to the Louisiana Constitution authorizing a Union Station or Stations *at New Orleans,"* whereas, in truth and in fact, under the provisions of this amendment the city was vested with the discretion of locating and establishing these facilities in either New Orleans or in any or all of the adjoining parishes of Jefferson, St. Bernard, Plaquemine, and St. Tammany. In addition, in this single proposal the voters were authorizing the city (1) to lay tracks, construct under and overpasses, acquire switch engines and other railroad equipment, maintain yards and freight terminals, and all necessary appurtenances; (2) to extend the city's power of expropriation into surrounding parishes and there acquire land and property

for the construction of the station itself or of the approaches to the station; (3) to vest in a committee composed largely of private individuals whose first allegiance is not to the city and its people but to the private carrier corporations they represent the right to police these properties not only in the city but also in these adjacent parishes where facilities in connection with the terminal may be located; (4) to lend the money of the taxpayers of New Orleans to railroad corporations to be used by them in defraying the portion of the expense connected with the improvement of these facilities that is to be borne by them; (5) to use the facilities for freight as well as passenger traffic; (6) to exempt railroads from taxation; (7) to float a $15,000,000 bond issue for the purpose of raising the city's share of the cost of constructing the project; (8) to bind the state as well as the city on the obligation of these bonds; and (9) to contribute any amount it might see fit toward the cost of constructing, as well as maintaining, the facilities. (Italics mine.)

The inclusion of these numerous provisions (and their ramifications) in one proposal under the guise of authorizing the city to build a passenger terminal within its limits was, to say the least, most confusing to the voters if, indeed, it can even be conceded they knew of the contents of the provisions of the amendment and their import. It certainly couples in one single proposal numerous propositions that, if submitted separately, the voters might have desired to vote against. This lumping together compelled the voters to choose the vicious propositions along with the meritorious one of permitting the city to build a terminal station, giving them no opportunity to discriminate between the numerous provisions and express their will as to any they might find undesirable.

To illustrate, I do not believe and I cannot assume that the people of New Orleans would have voted for this proposition if they had known or understood it was well within the discretion being vested in the New Orleans Commission Council to have the terminal constructed in the Parish of Jefferson, or that the people of Jefferson Parish would have voted for the proposal if they had understood that their property might be expropriated without the consent of their Police Jury, in contravention of the present policy of this state in such matters, and resulting in the removal from the parish's power to tax of the expropriated property, thus shifting the tax burden upon the remaining property by increasing it proportionately. Further, it is impossible for me to conceive of the voters of the state approving the building of this terminal in New Orleans if they knew or understood the obligations being incurred thereunder were to be backed by the full faith and credit of the entire state; nor can I, by any stretch of the imagination, allow myself to believe the people of the city and the state generally would

have voted for this amendment had they known or understood they were thereby authorizing the city (as will hereafter be more clearly demonstrated) to completely surrender its police power and to bargain away its governmental functions to private individuals who are not even residents of the state.

As a matter of fact, the majority opinion recognizes the fact that numerous of these proposals might not have met with the approval of the majority of the voters and that in order to secure their passage it was necessary to lump them together in a single proposition that could not help but meet with public approval, for in the opinion it is said: "The provisions of the amendment are so interrelated that it would not have been feasible to submit each one of them to the voters as a separate and independent amendment to the Constitution. *If they had been so submitted, and if the voters had voted for some of the propositions and against others, the purpose of the amendment might have been defeated.*" (Italics mine.)

I am of the further opinion that this amendment is unconstitutional because Section 31.3 of Article XIV amends other articles and sections of the constitution by implication, thereby doing indirectly what it has been specifically declared cannot be done directly in the case of Graham v. Jones, supra.

It is to be noted that Section 12 of Article IV of the constitution declares that *"The*

*funds, credit, property or things of value of the State, or of any political corporation thereof, shall not be loaned, pledged* or granted to or for any person or persons, associations or *corporations, public or private* * * *."* Nevertheless, without referring to this constitutional provision, the city is authorized in Section 31.3 of Article XIV to pledge not only the credit of the city on the bonded obligation to be floated by it for the construction of a terminal that is to be turned over to a committee dominated by private corporations and that is to be used exclusively by private transportation corporations, but the credit of the state as well. The city is further authorized to lend the money collected from its taxpayers to these railroads, to be used by them in defraying their share of the cost, in further contravention of this specific constitutional prohibition. (Italics mine.)

Further, this amendment violates Section 26 of Article XIV of the constitution, wherein the exclusive control, operation, management, and development of the Public Belt Railroad is vested in the Public Belt Railroad Commission, which must always be kept separate and distinct from any railroad, and which no railroad can be given the right or privilege of controlling, for although we find in subsection (A) of the amendment that this passenger terminal "and all property and rights of use or possession of property acquired, constructed or dedicated pursuant to Section 31.3 hereof, shall be under the control and man-

agement of the Public Belt Railroad Commission," and in subsection (H) that "Nothing herein contained shall be deemed to repeal, limit, modify or affect any police power or other power of the City of New Orleans, through its Commission Council, or the Public Belt Railroad Commission, or otherwise," in subsection (A) which gives the Public Belt Railroad Commission control of these facilities, this commission is permitted, by contract, or the Commission Council by resolution, to delegate to a committee composed of representatives of any and all interested parties, "including * * * representatives of any railroad company or railroad companies," the power of "supervising or controlling the acquisition, construction, maintenance and operation of said passenger station or stations, the approaches thereto and appurtenances thereof, and any tracts or other property * * *." As actually constituted under the present contract, this committee consists of 6 representatives of the city and its taxpayers and 10 representatives of the railroads, thus giving the railroads the edge in all controversial decisions from the sheer weight of their larger number (which voting power can be greatly increased in favor of the railroads) and clearly demonstrating that the city has no possible hope of ever putting across any policy or program with respect to these facilities that is found to be inimicable to the interests of these private corporations who will use them exclusively, for the city is irrevocably bound not to change

the committee as it is constituted in the contract. In addition to all of this, in Section 5 of the contract the city has agreed that the members of the committee may be represented and vote by proxy, making it entirely possible that this committee will eventually be controlled by persons who have never been, never expect to be, and never intend to be residents of either New Orleans or Louisiana; consequently, having no interest in the welfare of our citizens but only in the private corporations whom they serve.

Aside from the flagrant manner in which these provisions of our basic law have been flaunted in the adoption of this amendment, I find from a study and analysis of the contract itself that its stipulations not only violate specific mandates of the very amendment that authorizes it but completely ignore, contract away, or otherwise violate several other parts of the constitution and various acts of the legislature.

As pointed out above, in subsection (H) of the amendment, it is provided that "Nothing herein contained shall be deemed to repeal, limit, modify or affect any police power or other power of the City of New Orleans, through its Commission Council, or the Public Belt Railroad Commission, or otherwise," yet we find the city in this contract (1) surrendering to a non-governmental agency that is not responsible to the public its police power that "Neither Legislature nor people may bargain away * * * by contract or otherwise" (State

ex rel. Porterie v. Walmsley, 183 La. 139, 162 So. 826. See also, Shreveport Traction Co. v. City of Shreveport, 122 La. 1, 47 So. 40, 129 Am.St.Rep. 345; State v. City of New Orleans, 151 La. 24, 91 So. 533); (2) vesting in this non-governmental committee authority to expropriate property deemed necessary for the rights-of-way for the approaches to this terminal or of the terminal itself not only in New Orleans but also in adjacent parishes, a function that is truly a sacred governmental prerogative since "The right or power of eminent domain * * * is an inherent and essential power of sovereignty, and inheres in every independent state, and it is inalienable and cannot be surrendered" (Black, Constitutional Law, Section 180, page 455); (3) granting this committee the right to expropriate and remove from taxation not only the property that is to be used in constructing the new terminal, but also the property upon which the railroad facilities now in the city are constructed and upon which the railroads are paying taxes, thus permitting the railroads, in effect, to exempt themselves from taxation; and (4), finally, throwing to the winds its inherent power of removal that is so inseparably a part of the power of appointment when the tenure of an office is not prescribed by law, for the city has not retained to itself the right to change either the membership of this committee or its voting rights. And in delegating these very vital functions of government to a non-governmental committee dominated by private corporations, the city has not retained a single vestige of supervision or control over its actions and this committee, in whatever it does, is neither answerable to the government nor to the people.

In addition to all of this, it is provided in Section 85 of the contract that in so far as the acquisition, construction, maintenance, and operation of this terminal is concerned, Act No. 271 of 1908 (requiring that mechanics employed on all state or public buildings and work shall be citizens of Louisiana), and its amending act, No. 144 of 1934; Sections 58 and 60 of Act No. 159 of 1912, (providing that contracts of more than $200 shall be executed in the name of the city and that all contracts of more than $500 involving either work or material on public buildings or property shall be given to the lowest bidder) and the later act, No. 127 of 1940; shall not be applicable or controlling and shall be considered as abrogated. In this same Section 85 Act No. 171 of 1940, setting up Civil Service in cities of more than 100,000, is suspended in so far as these public facilities are concerned, with the result that in view of the fact the committee has exclusive right to hire, fire, and fix wages for the employees in the terminal, none of these employees can receive the benefit of civil service and it is entirely possible these employees will be sent into this state from other sections of the country by these railroads. The city has thus contracted away what is the legislature's exclusive consti-

tutional province of passing, amending, and repealing acts (Article III), as well as the authority vested in the courts under Article VII of the constitution of interpreting the laws of the state and determining their applicability. By this stipulation of the contract the city and these railroads have also abrogated the provisions of Article 11 of the Revised Civil Code providing that "Individuals can not by their conventions, derogate from the force of laws made for the preservation of public order or good morals," and of Article 12, which provides that "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed."

The result of this action is that although this terminal station is to be a public building, constructed with public funds, it is to be run by private corporations, and the employees who are to maintain and construct it are not public employees and are not given the advantages and privileges that are accorded public employees.

I think, too, that the provisions of this contract further violate the policy of this state as enunciated in Section 14 of Article XIV of the Constitution and in Act No. 46 of the Extra Session of the Legislature for the year 1921 that all bonds issued in the state shall become due and payable in *annual* installments beginning not more than *three* years after the date of their issuance, and that the amounts to be paid annually toward their retirement is to be fixed in such a manner that when the an-

nual interest is added to the principal amount to be paid the total amount retired each year will be as nearly equal as practicable, for in Section 7–A of the contract it is provided that the $15,000,000 bond issue is to mature from January 1, 1953 (more than three years after their issuance in 1948) through January 1, 1989, but that no bonds shall mature from 1989 until 1998, with the result that for this period of ten years, and until the $100,000 bonds mature in 1998, no bonds will be retired. Inasmuch as the rental the railroads are supposed to pay for the use of these terminal facilities that the city is to build and maintain at the cost of the taxpayers up until the last maturity is an amount equal to the principal and interest on the bonds, and the rental to be paid after the last maturity date is an amount equal to the ad valorem taxes on these facilities if they were not tax exempt, it is obvious this arbitrary extension of the last maturity date was incorporated in the contract for the ostensible purpose of allowing the railroads to rent these facilities during this ten year period for the nominal amount of interest payments due on $100,000 bonds. This provision likewise has the further effect of granting a tax exempt status to the carriers for an additional 9 years.

Finally, in Section 24 of Article XIV of the constitution, it is provided that the city "shall not * * * pledge its credit or anticipate the collection of any of its taxes * * * nor shall said City make any con-

tract or incur any debt or obligation for any purpose whatsoever *unless sufficient funds not otherwise appropriated to pay and discharge same are actually in the treasury of said City at the time of making the contract or incurring the debt or obligation and are specifically set aside and dedicated to said purpose * * *.*" In Section 7 of Article 2 of the contract, the city has absolutely and irrevocably bound itself for a period of 100 years (50 years under the contract with the railroads, the latter being given the option of renewing the rental thereof for an additional 50 years although no such option is given the city), to appropriate from the general funds of the city $500,000 annually, all in addition to the money raised by the bond issue, and this amount is "to be dedicated and solely and exclusively used, to the extent necessary, for the same purpose for which the proceeds of the bonds referred to in this paragraph are to be segregated (i. e., for the purpose of carrying out and paying the city's portion of the cost of the elimination of grade crossings under the agreement), * * * *as well as for the payment of the cost of the other obligations and undertakings assumed by the City in this agreement.*" This is unquestionably in direct contravention of the constitutional prohibition above quoted, as well as in contravention of the provisions of Section 31.3 of Article XIV of the constitution authorizing the contract itself. (Italics mine.)

In an amendment that purported to authorize the City of New Orleans to issue bonds to cover its portion of the cost of a terminal consolidation and grade separation program, it is impossible to assume the people intended (and they should not have been compelled) to authorize the city to set up a plan whereby it would finance the obligation of the carriers in the same project; infringe on the rights of adjacent parishes, embark upon a vast tax exemption scheme for the benefit of the carriers, forever surrender their right of eminent domain with regard to railroad properties not made a part of the terminal program as well as those that are made a part of it. The position I take is that it was unconstitutional to force the voters to grant these vital prerogatives to the city (all of which are in derogation of positive law) to the city under the guise of approving the establishment of a union terminal station in New Orleans.

It is also my belief that the contract itself is not only unconstitutional and invalid for the many reasons above pointed out, but for the further reason that it was entered into with no regard to the general financial picture of the city government. Under its provisions as they now stand, the entire tax structure of the city will, in all probability, be damaged, so crippling and hamstringing the city from a financial standpoint that it will be impossible for any additional public improvements to be undertaken in New Orleans for the next

hundred years. It will also render the $15,000,000 bond issue of such uncertain value as to make it difficult if not impossible to dispose of the bonds, as well as necessitate the imposition of additional taxes.

The ramifications of this contract are such that the city has practically agreed to bankrupt itself for generations to come for the sole purpose of establishing a union terminal in New Orleans that will facilitate and further the business of private corporations. Such a course not only is not authorized by the adoption of Section 31.3 of Article XIV of the constitution, but the action the city has taken under this authorization constitutes a gross abuse of the discretion that was vested in it of consolidating the carrier lines feeding the city "in any manner it may determine."

For these reasons, I dissent.