Claude L. KOHLER, David L. Burnes and Rene S. Wogan, individually and as citizens, taxpayers and voters of the State of Louisiana, for themselves and all other persons similarly situated and the Penniston-General Taylor Association and the Uptown Civic Association, Plaintiffs,

v.

A. P. TUGWELL, individually and as Treasurer of the State of Louisiana, Neville Levy, individually and as Chairman of the Mississippi River Bridge Authority and/or the Greater New Orleans Mississippi River Bridge Authority and Arsene L. Stewart, individually and as Director of the Department of Highways for the State of Louisiana and John J. McKeithen, individually and as Governor of the State of Louisiana, and their successors in office, Defendants.

Civ. A. No. 68–253.

United States District Court
E. D. Louisiana,
New Orleans Division.

Oct. 24, 1968.

Judgment Affirmed Feb. 24, 1969.

See 89 S.Ct. 879.

Donald V. Organ, New Orleans, La., for plaintiffs.

Jack P. Gremillion, William P. Schuler, Baton Rouge, La., William P. Curry, Jr., Louis B. Porterie, Jesse S. Guillot, New Orleans, La., for defendants.

Before WISDOM, Circuit Judge, and BOYLE and RUBIN, District Judges.

RUBIN, District Judge:

Louisiana citizens seek an injunction prohibiting any action under the authority of a state constitutional amendment adopted in 1966 on the ground that the designation of the amendment as it appeared on the state ballot misled voters. Hence, they contend that those who voted in favor of the enactment were deprived of their right to vote, and were denied both Due Process of Law [1] and the right to a Republican Form of Government.[2]

In 1952 Louisiana's voters adopted a constitutional amendment to authorize the dedication of state revenues to supplement the financing of a toll bridge. After the bridge was built, some of its users objected to the payment of tolls. During the 1964 gubernatorial campaign, one of the candidates promised that, if he were elected, passage on the bridge would be free. Upon his election, the Governor kept his promise. He approved a contract between the Mississippi River Bridge Authority and the State of Louisiana Department of Highways.[3] This provided that State highway funds would be paid to service the bonds and tolls would not be collected so long as this was done.

Later the Mississippi River Bridge Authority began to plan the possible construction of additional bridges across the river in the New Orleans area, and it was necessary to amend the Constitution to permit the further pledge of state funds to assist in financing the construction of any new bridge.

Accordingly, on November 8, 1966, Louisiana's citizens were presented with the proposal as part of a ballot containing forty-four other proposed amendments to their Constitution,[4] already the longest in the Union.[5] Proposed Amendment 26 was identified on the ballot as follows:

"For or Against:"

"The proposed amendment to Article VI, Section 22(a) (4) of the Louisiana Constitution to amend so as to provide for a dedication of funds to the police jury of the parish of Tangipahoa and a dedication of funds to the St. Charles-St. John the Baptist Bridge and Ferry Authority *and so as to provide for funds for additional river crossings across the Mississippi River at or near New Orleans for so long a time as any bonds, whatsoever are outstanding in connection with any such bridge and reimposing reasonable tolls on all bridges and facilities of the Greater New Orleans Mississippi River Bridge Authority.*" (Emphasis supplied.)

Louisiana's constitution requires that proposed constitutional amendments be submitted to the voters but mentions the manner in which they are to be described only by stating that amendments "shall be so submitted as to enable the electors to vote on each amendment

---

1. U.S.Const. amend. XIV, § 1.

2. U.S.Const. art. 4, § 4.

3. The trustee for the bondholders neither concurred in nor objected to the contract and the arrangement has continued in force without apparent objection by the bondholders.

4. The full ballot is reprinted in Appendix A.

5. See Havard, "The 1958 Proposals to Amend the Louisiana Constitution," 19 La.L.Rev. 128 (1958) for a discussion of government by constitutional referendum.

separately." [6] However, the State Constitution does require [7] the full text of each proposed amendment to be published in a newspaper in each of the state's sixty-four parishes twice during a period at least thirty and not more than sixty days before the election, and this was done.

The plaintiffs contend that the language in the ballot's description of Amendment 26 led voters to believe that tolls would be reimposed on the existing bridge as soon as the constitutional amendment became effective, twenty days after issuance of the Governor's proclamation declaring its passage,[8] when in fact the amendment contains no requirement that tolls be reimposed. They urge that voters were misled, for the ballot description would lead the average voter to read the words " . . . *and reimposing reasonable tolls on all bridges*" to mean *as soon as this amendment becomes effective.*

The defendants read the ballot designation as saying that the amendment is "to provide for * * * reimposing reasonable tolls," finding the inference in the text that the tolls will be reimposed when additional bridges are built.

The relevant part of the amendment itself first provides for the payment of certain sums from State Highway Fund No. 2 to the Parish of Tangipahoa and to the St. Charles—St. John the Baptist Bridge and Ferry Authority. Then it states:

"* * * provided that the foregoing $100,000.00 annual payment to the governing authority of the parish of Tangipahoa and the foregoing $150,000.00 annual payment to the St. Charles—St. John the Baptist Bridge and Ferry Authority shall in no event become due and payable unless and until presently outstanding bonds of the Mississippi River Bridge Authority are paid or refunded in full in principal and interest in order for the building of an additional Bridge or Bridges within the Jurisdiction of the Mississippi River Bridge Authority for which financing the imposition or re-imposition of tolls is required."

It is charitable to say the language of this clause insofar as it relates to "the building of an additional Bridge or Bridges" is inartistic. These words seem to us, in Judge Learned Hand's memorable phrase, to "dance before [our] eyes in a meaningless procession * * * leav[ing] in [our] mind[s] only a confused sense of some vitally important, but successfully concealed purport * * *." [9] At best ambiguous, they may in fact be unintelligible. But no issue of their interpretation is raised here, and whether meaning can be found in them is a matter for the Louisiana courts.[10]

So far as we can divine the intended meaning without resorting to haruspication, we surmise that the provision merely suspends any payments to the designated parochial authorities until after payment in full of all bridge bonds outstanding when the amendment was adopted and of all bonds issued subsequent to its passage financed by the imposition or reimposition of tolls. If so, the constitutional amendment makes no requirement that tolls be reimposed at any time, although the exigencies of financing and the demands of bond buyers may as a practical matter make the levying of tolls inescapable.

It is apparent that the text is so turgid that it would be difficult to say that any ballot designation could describe it accurately. The voters could attempt to derive their own interpretations from the entire text of the pro-

---

6. La.Const. art. XXI, § 1.

7. Id.

8. Id.

9. Learned Hand, Thomas Walter Swan, 57 Yale L.J. 167, 169 (1947).

10. Graham v. Jones, 198 La. 507, 3 So. 2d 761 (1941).

posed amendment, which was published twice in every parish in the state. The language that[1] appeared on the ballot was not phrased by some official [11] but was set forth verbatim in the legislative act that proposed the constitutional amendment. What appeared on the ballot was sufficient to tell the voters what the complicated constitutional amendment was about. It was up to them to study its exact text.

The issue before us is not a proposition for grammarians. If the average voter had to decide what he was voting on from the ballot alone, he might well have read it as the plaintiffs do. But he did not have to decide from this summary. He could look at the amendment itself.

The ballot, as will appear from Appendix A, was long. No one who has voted in any election at which voting machines are used can fail to know that Louisiana's voters, once they stand before a voting machine in a voting booth, are not likely to be able to study the description of each proposition on the ballot. They must come to the polls prepared in advance to vote on the amendments if they are to vote with any semblance of understanding.

 The requirements of both the Louisiana Constitution and the Federal Constitution were interpreted by the Louisiana Supreme Court in Hotard v. City of New Orleans [12] to mean: "All that is required to be printed on the ballot is sufficient information to identify the proposed amendment which the voter is voting for or against." [13] "Un-

deniably," as the United States Supreme Court said, in Reynolds v. Sims,[14] "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." However, a federal court must not interfere with the internal affairs of a State unless it is necessary to do so to protect those rights guaranteed every citizen by the Federal Constitution.[15] The procedure followed by Louisiana does not deprive the plaintiffs of Due Process for it is sufficient that Louisiana's voters were informed by the ballot of the subject of the amendment, were given a fair opportunity by publication to consider its full text, and were not deceived by the ballot's words.

Nor did Louisiana deny the plaintiffs their right to a Republican Form of Government. Article IV, Section 4, of the Constitution provides, "The United States shall guarantee to every State in this Union a Republican Form of Government." My brothers and I agree that the state action here challenged does not invade the plaintiffs' rights under the Guaranty Clause for the same reasons as those we have stated with respect to due process. But we differ on whether there is another and more fundamental reason why the plaintiffs may not successfully invoke the Guaranty Clause.

Ever since the decision in Luther v. Borden, 1849, 7 How. (U.S.) 1, 12 L.Ed. 581, the Guaranty Clause has been held to be primarily political in nature, and its enforcement has been held to be a matter for Congress rather than for the courts.[16]

11. See Blitz v. Neuner, 194 Or. 1, 240 P. 2d 1193 (1952); Dodd v. Neuner, 118 Or. 510, 216 P.2d 670 (1950).

12. 213 La. 843, 35 So.2d 752, 756 (1948).

13. An appeal from *Hotard* was dismissed by the Supreme Court for want of a substantial federal question. 335 U.S. 803, 69 S.Ct. 57, 93 L.Ed. 360 (1948).

14. 377 U.S. 533, 554, 84 S.Ct. 1362, 1377, 12 L.Ed.2d 506 (1964).

15. Ohio Oil Co. v. Conway, 281 U.S. 146, 50 S.Ct. 310, 74 L.Ed. 775 (1930); NAACP v. Thompson, 357 F.2d 831 (5 Cir., 1966).

16. Pacific States Telephone and Telegraph Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912); Coleman v. Miller, 307 U.S. 433, 455–456, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); Taylor and Marshall v. Beckham (No. 1), 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900).

Both of my brothers read Baker v. Carr [17] and Reynolds v. Sims [18] as expressing second thoughts on the subject. However, the majority opinion in *Baker* thoroughly reviewed the decisions dealing with the Guaranty Clause and stated: "The Court has [long] refused to resort to the Guaranty Clause * * * as the source of a constitutional standard for invalidating state action." [19] The remainder of the opinion justifies the conclusion that the Court in 1962 still considered, as it said it had "consistently held" previously, "that a challenge to state action based on the Guaranty Clause presents no justiciable question * * *." [20] The opinion in Reynolds v. Sims does contain the passing observation that "some questions raised under the Guaranty Clause are nonjusticiable, where 'political' in nature and where there is a clear absence of judicially manageable standards," [21] and cites as authority the majority opinion in Baker v. Carr. This sentence, however, was employed merely to preface the Court's observation, "Nevertheless, it is not inconsistent with this view to hold that * * * the Equal Protection Clause can and does require more." [22] This introductory sentence does not justify the conclusion that the Court was altering the views it had so recently and fully considered in Baker v. Carr.

No federal judge can deny that federal courts should be loath to read any clause out of the Constitution as judicially unenforceable. But courts should also be reluctant to cast doubt on established constitutional doctrine. Judges should not forget that the judiciary is not the sole guardian of the Constitution. It is the duty of the Congress and the President to uphold and defend portions of the Constitution that, for one reason or another, have not been considered appropriate areas for judicial action.[23] If the decisions in Luther v. Borden and Baker v. Carr require reappraisal, it is not proper to do it here and now.

Whichever view of judicial enforcement of the Guaranty Clause is taken, neither that clause nor the Fourteenth Amendment requires the state to describe on the ballot itself the contents of a proposition submitted for a popular vote. Nor do the plaintiffs assert such a proposition. They contend merely that the state must not mislead its voters. It is unnecessary for us to determine exactly what each clause does require of the state: we accept the plaintffs' premise that the state may not mislead its voters to the extent that they do not know what they are voting for or against. And we find that this was not done here.

Since Louisiana's legislature has not denied its citizens any federal constitutional rights by the manner in which the state's constitutional amendment was submitted to them, the plaintiffs' suit will be dismissed.

17. 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

18. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

19. 369 U.S. at 223, 82 S.Ct. at 713.

20. 369 U.S. at 224, 82 S.Ct. at 714.

21. 377 U.S. at 582, 84 S.Ct. at 1392.

22. Id.

23. Justice Frankfurter in his dissent in Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, reviewed a number of areas in addition to the Guaranty Clause, that traditionally have been held nonjusticiable. These include: cases concerning war and foreign affairs, the extent of congressional regulatory power over the tribes and dependent communities of Indians, matters concerning the structure and organization of the political institutions of the States, and "abstract questions of political power, of sovereignty, of government."

# APPENDIX A

**SAMPLE BALLOT**

INSTRUCTIONS TO VOTERS

To Vote STRAIGHT TICKET Turn Large Lever by Emblem to left
This Mark X is for all Party Candidates, but NOT for AMENDMENTS
To Vote AMENDMENTS and SCHOOL BOARD Turn Each Lever
SEPARATELY

LEAVE X'S SHOWING LIKE THIS

| | GENERAL ELECTION NOVEMBER 5, 1946 DEMOCRAT | GENERAL ELECTION NOVEMBER 5, 1946 REPUBLICAN | NOMINATION PAPER NOVEMBER 5, 1946 Orleans Parish School Board | | GENERAL ELECTION NOVEMBER 5, 1946 AMENDMENTS | CONSTITUTIONAL AMENDMENTS |
|---|---|---|---|---|---|---|
| | ORLEANS WARDS 3, 5, 6, 7, 13, 15, 16, 17 COLUMN 2 | ORLEANS WARDS 3, 5, 6, 7, 13, 15, 16, 17 COLUMN 4 | | | ORLEANS COLUMN 10 | |

**For UNITED STATES SENATOR** — ALLEN J. ELLENDER (Democrat)

**For MEMBER, UNITED STATES HOUSE OF REPRESENTATIVES** NINETEENTH CONGRESS OF THE UNITED STATES, SECOND CONGRESSIONAL DISTRICT — HALE BOGGS (Democrat); LEONARD L. LIMES (Republican)

**For ASSOCIATE JUSTICE** SUPREME COURT OF LOUISIANA, FIRST SUPREME COURT DISTRICT — WALTER B. HAMLIN

**For JUDGE, COURT OF APPEAL** PARISH CIRCUIT AT LARGE — LOUIS H. YARRUT

**For JUDGE** CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS, DIVISION D — WALTER F. MARCUS, JR.

**For JUDGE** CRIMINAL DISTRICT COURT FOR THE PARISH OF ORLEANS, SECTION F — THOMAS M. BRAHNEY, JR.

**For JUDGE** MUNICIPAL COURT OF NEW ORLEANS — W. BLAIR LANCASTER, JR.

**For JUDGES** TRAFFIC COURT OF NEW ORLEANS — OLIVER S. DELERY; LOUIS P. TRENT

**NOMINATION PAPER**
**ORLEANS PARISH SCHOOL BOARD**
(SOME TO BE ELECTED)

Nomination Paper — Orleans Parish School Board: JAMES H. HIGGINS; IGNACE G. KREIER; FRANK J. LOPICCOLO; ROBERT CORNELIUS SMITH

**CONSTITUTIONAL AMENDMENTS** — Amendments 1 through 25 (FOR / AGAINST)

Amendments 26 through 45 (FOR / AGAINST)

WISDOM, Circuit Judge; whom BOYLE, District Judge, joins (concurring).

I concur in the result and all of the opinion relating to the Fourteenth Amendment. I do not go all the way with my brother Rubin's views on the Guaranty Clause.

Section 4 of Article IV declares that "*the United States* [not Congress] shall guarantee to every State in this Union a Republican Form of Government". (Emphasis and bracketed words added.) It is true that Luther v. Borden[1] put this giant to sleep.[2] And the expanding importance of the Fourteenth Amendment, through the due process and equal protection clauses and through its incorporation of most of the Bill of Rights, reduced the need for courts to resort to the Guaranty Clause to protect the rights of individuals against a state's abuse of governmental processes. But the guarantee still has a proper place in a federal system of checks and balances.[3]

■ In Baker v. Carr[4] Justice Brennan, for the Court, quoting Luther v. Borden, concluded that only Congress could enforce the guarantee. However, the identical issue held nonjusticiable under the guaranty clause was justiciable under the equal protection clause; the underrepresented citizens therefore could live without benefit of Section 4,

Article IV. Justice Frankfurter disagreed with the Court. He felt strongly that malapportionment of a state legislature was a nonjusticiable controversy, under the Guarantee Clause or under the Equal Protection Clause "masquerading" under that "label". He pointed out, however, in his dissenting opinion: Article IV, section 4 "is not committed by express constitutional terms to Congress. It is the nature of the controversies arising under it, nothing else, which has made it judicially unenforceable". 369 U.S. at 297, 82 S.Ct. at 754, 7 L.Ed.2d at 732. Justice Douglas, in his concurring opinion, disagreed with the court—and with Justice Frankfurter: "The right to vote is inherent in the republican form of government".

He said:

"The statements in Luther v. Borden * * * that this guaranty is enforceable only by Congress or the Chief Executive is not maintainable. Of course the Chief Executive, not the Court, determines how a State will be protected against invasion. Of course each House of Congress, not the Court, is 'the judge of the elections, returns, and qualifications of its own members.' * * * But the abdication of all judicial functions respecting voting rights * * * indeed is contrary to * * * the * * * full panoply of judicial protection to

---

1. Luther v. Borden, 1849, 7 How. (U.S.) 1, 12 L.Ed. 581.

2. "It is a clause which is like a sleeping giant in the constitution, never until this recent war awakened, but now it comes forward with a giant's power." Charles Sumner, Cong.Globe, 40th Cong., 1st Sess. 614 (1867).

3. On the history and potential of the clause see Bonfield, The Guarantee Clause of Article IV, Section 4: A Study in Constitutional Desuetude, 46 Minn.L.Rev. 513 (1962). See also Franklin, Concerning the Influence of Roman Law on the Formulation of the Constitution of the United States, 38 Tul.L.Rev. 621 (1964)

and Franklin, Influence of the Abbé de Mably and of Le Mercier de la Rivière on American Constitutional Ideas Concerning the Republic and Judicial Review, in Perspectives of Law, Essays for Austin Wakeman Scott, p. 96 (1964). For a discussion of the clause in the light of Baker v. Carr, see Bonfield, Baker v. Carr, New Light on the Constitutional Guarantee of Republican Government and Nahstoll, The Role of the Federal Courts in the Reapportionment of State Legislatures, 50 Am.Bar Ass'n Jour. 842 (1964).

4. Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663.

voting rights. \* \* \* The Court's *refusal to examine the legality of the regime of martial law which had been laid upon Rhode Island is indefensible*." 369 U.S. at 243, n. 2, 82 S.Ct. at 723, 7 L.Ed.2d at 700 n. 2.

In Reynolds v. Sims [5] the Court noted that in *Baker* it had stated that "*some* questions raised under the Guaranty Clause are nonjusticiable, where 'political' in nature and where there is a clear absence of judicially manageable standards". (Emphasis added.) 377 at 582, 84 S.Ct. at 1392, 12 L.Ed. at 539. *The nature of the question, therefore, and not the mere invocation of the clause*, determines whether a contention is justiciable and the clause judicially enforceable.

■■ The question in this case is whether the constitutional amendment was adopted in an unrepublican manner; more specifically, whether the ballot was so misleading that the people were deprived of one of the fundamental rights inherent in a republican government, the right to vote on an amendment to their constitution. The same standards "judicially manageable" in determining whether the plaintiffs were deprived of due process would seem to be applicable in determining whether they were deprived of the protection of a republican government. I regard the issue here, therefore, as justiciable under the Guaranty Clause. On the merits, however, and for the same reasons the due process clause was not

offended, I would hold that the process by which Amendment 26 to the Louisiana Constitution was adopted does not offend Article IV, Section 4 of the United States Constitution.

The line of judicial development of the republican guarantee, bent and broken since Luther v. Borden, is not beyond repair. Some day, in certain circumstances, the judicial branch may be the most appropriate branch of government to enforce the Guaranty Clause.[6] Federal courts should be loath to read out of the Constitution as *judicially* nonenforceable a provision that the Founding Fathers considered essential to formulation of a workable federalism. James Madison best stated the case for Article IV, Section 4. He regarded it as the basis for the doctrine of federal interposition:

"It may possibly be asked, what need there could be of such a precaution, and whether it may not become a pretext for alterations in the State governments, without the concurrence of the States themselves. These questions admit of ready answers. If the interposition of the general government should not be needed, the provision for such an event will be a harmless superfluity only in the Constitution. But *who can say what experiments may be produced by the caprice of particular States, by the ambition of enterprising leaders, or by the intrigues and influence of foreign* powers?" [7] (Emphasis added.)

---

5. Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

6. "Today would this Court hold nonjusticiable or 'political' a suit to enjoin a Governor who, like Fidel Castro, takes everything into his own hands and sus-

pends all election laws?" Baker v. Carr, 369 U.S. at 247 n. 3, 82 S.Ct. at 725 n. 3, 7 L.Ed.2d at 703 n. 3, Justice Douglas concurring.

7. The Federalist, No. 43, p. 312 (Wright Ed., 1961).