REDMANN, Judge.
Olympia Roofing Company, Inc. bought certain land at a private sale negotiated with and executed by the Union Passenger Terminal Committee, purporting to act as the “City of New Orleans through the Union Passenger Terminal Committee,” under claimed authority hereinafter delineated. When Olympia applied to the City for a building permit the City refused the permit on the theory Olympia’s purported purchase was a nullity, and that title to the property remained in the City.
Olympia then brought this proceeding to require the City to recognize Olympia’s title and issue the requested building permit. A fuller report of the circumstances may be found at La.App., 324 So.2d 98, where we denied a motion to dismiss this appeal.
The City appeals from a judgment declaring Olympia the owner of the land and ordering the City to issue the building permit.

The Issue

Generally, the position of the City of New Orleans is that under the applicable constitutional provisions the City itself alone has the power to sell, and even under the Agreement constituting the Committee that power remains in the City itself.
Olympia’s position is that under that Agreement’s grant to the Committee of “supervision and control of all * * * acquisition and disposal” of Union Passenger Terminal land by the City, the Committee has the power to sell acting as the City through the Committee.
There is not the least suggestion, and not the faintest suspicion, that the Committee’s' sale was for less than market value or otherwise involved any favoritism.
Nor is there any argument against Olympia’s entitlement to the desired building permit if Olympia’s title is good.
The sole issue is thus whether the Committee had authority to make the sale.

Constitutional Provisions

La. Const, art. 14 § 31.3 is the fundamental law relative to the creation of the New Orleans Union Passenger Terminal. The Committee exists because it was created under authority of that constitutional provision. It can have no power contrary to that provision.
*275 The constitutional provision’s “General Authorizations” begin:
“The City of New Orleans, acting through the Public Belt Railroad Commission, shall have the power, in any manner it may determine, to acquire, construct, maintain and operate one or more railroad passenger stations * * ” (emphasis supplied)
and all approaches and appurtenances. In “the maintenance and operation” of the station etc. no City or Public Belt funds (except from station etc. revenues) could be expended.
And the City, “through” Public Belt, is authorized to subsequently improve, enlarge, etc. any station.
And the City, “through” Public Belt, is authorized to lend to railroad companies, for specific related purposes, funds from the proceeds of the station revenue bonds.
Subsection (A) of § 31.3, “Contracts”, authorizes the City, “through” Public Belt, to contract with railroads for the use by them of the station and approaches, etc. Then follows the provision that the station etc.
“ * * * shall be under the control and management of the Public Belt Railroad Commission, but any contract entered into pursuant to this Subsection (A) or resolution adopted by said Commission by a vote of a majority of all the members thereof, may vest in a Committee or other body composed of representatives of any and all interested parties, including but not limited to representatives of any railroad company or railroad companies, constituted as provided in such contract or resolution, such powers as may be specified in such contract or resolution for supervising or controlling the acquisition, construction, maintenance and operation of said passenger station or stations, the approaches thereto and appurtenances thereof, and any tracks or other property referred to in
Section 31.3 hereof. * * *" (Emphasis supplied.)
Subsection (A) also declares the policy that the station “shall not be operated at a profit to the City of New Orleans or the Public Belt Railroad Commission”, but
“ * * * after all costs with interest have been reimbursed (but in no event sooner than 1988), the City of New Orleans shall receive, in addition to all costs of maintenance and operation, a net rental in an amount equal to what the taxes would be on the stations or facilities furnished by it, based on their then fair value if the same were not tax exempt.” (Emphasis supplied.)
Subsection (B), titled “Bond Issue”, authorizes the City “through its Commission Council” to issue up to $15,000,000 of its bonds, on recommendation of Public Belt, to acquire and construct .the station and approaches, and any land, etc.
Limitations on this authority include, in Subsection (B) (a), that the bonds were to be secured solely by (1) mortgage of the station, approaches, and generally all property acquired pursuant to § 31.3; (2) pledge of net revenues from operation; and (3) pledge and assignment of contracts for use of facilities by railroads under subsection (A). The bonds were to be paid solely from those same sources, “and not by any tax * * * nor out of any other funds, revenues” or other assets of the City.
(Thus it is clear that neither the bonds for acquisition and construction, nor the maintenance and operation, could in any part be paid for by the City.)
The limitations of paragraph (a) of Subsection (B) further provide:
“ * * * In the event of any foreclosure of any such mortgage, the purchaser at foreclosure sale, and his successors and assigns, shall have a franchise for the use and operation of said passenger station or stations and all other property mortgaged thereby, subject to *276 any contract or contracts which may be made superior to the lien of the mortgage foreclosed upon, until the latest date of maturity specified in any bond secured thereby at any time theretofore outstanding, at the end of which period title thereto shall revert to the City of New Orleans.'- Said mortgage or mortgages shall contain such stipulations, terms, provisions and conditions, not inconsistent herewith, as the City of New Orleans, upon the recommendation of the Public Belt Railroad Commission, may determine.” (Emphasis supplied.)
A further limitation on the bond-issuing authority is that of paragraph (b) of Subsection (B) :
“Said passenger station or stations, the approaches thereto and appurtenances thereof, and all other property and right of use or possession of property acquired, constructed or dedicated pursuant to Section 31.3 hereof, which shall he owned by the City of New Orleans, shall be exempt from every form of taxation, and shall in no manner be hypothecated, leased or alienated by the City of Neiv Orleans, except as herein set forth; provided, however, that any real or personal property acquired pursuant to Section 31.3 hereof not needed for the construction or operation of any facility referred to in Section 31.3 hereof may, by the Commission Council of the City of New Orleans, be leased or sold or dedicated to public purposes of the City of New Orleans. The proceeds of any such lease or sale shall be applied to the payment of the obligations issued hereunder.” (All emphasis supplied.)
Subsection (D) of § 31.3, “Grade crossing elimination”, authorized such eliminations to be included in “any project hereunder”, payable in whole or part by the station revenue bonds authorized by subsection (B) ;
“ * * * but the City of New Orleans is hereby empowered to contribute any funds towards such cost to such extent as its Commission Council may determine * * $ ”
(And, we note here, the Agreement between the City and “the City through Public Belt” and the interested railroads did require the City to contribute 85% of the cost of overpasses and underpasses to eliminate grade crossings.)
From all the cited provisions of Const, art. 14 § 31.3, our conclusion is that the station, approaches and other property were to belong to the City. But they were to be under the control and management of Public Belt, although (as in fact developed) a Committee might be empowered “for supervising or controlling the acquisition, construction, maintenance and operation” of the facilities. Yet, although the constitution many times authorized action by the City “through the Public Belt Railroad Commission”, the sole provision for disposing of surplus property was that it “may, by the Commission Council of the City of New Orleans, be leased or sold or dedicated to public purposes * * Except for that provision, property acquired under § 31.3 “shall in no manner be * * * alienated by the City of New Orleans,” Subsection (B) (b).

The Agreement

As authorized by Const, art. 14 § 31.3 (A), the Union Passenger Terminal Committee was created under an Agreement which granted to the Committee supervision and control of acquisition, construction, maintenance and operation of the facility. This grant of power was upheld in Hotard v. City of New Orleans, 213 La. 843, 35 So.2d 752 (1948).
One provision of the Agreement is:
“City To Acquire Land
“Section 9. A. The City agrees:
(i) To acquire or grant the necessary lands and rights for the Union Passenger Terminal;
*277 (ii) To lease or acquire, hold temporarily and subsequently dispose of any other lands or rights which may be required for the proper performance of the obligations pursuant to sub-paragraph (i) ; and
(iii) To lease or acquire, hold temporarily and subsequently dispose of any other lands or rights which may be required to facilitate the construction of the Union Passenger Terminal.
“Supervision and control of all such acquisition and disposal shall be exercised by the Committee. Any proceeds received prior to Completion Date from the disposal of any lands or rights acquired pursuant to subparagraphs (ii) and (iii) of this paragraph shall be deemed miscellaneous receipts; any proceeds from any such disposal received after Completion Date shall be applied as provided in Section 30, Paragraph C, subparagraph (i), clause (d).
Exhibit 2 of the Agreement, being the Indenture to secure the bonds, provided in art. VII for partial releases of mortgaged property as follows:
“Section 1. The City at any time, or from time to time, may sell any real estate subject to the lien of this Indenture; and the Trustee shall release the same from the lien of this Indenture upon receipt by the Trustee of:
(a) A request for such release from the Committee;
(b) A certificate from the Chief Engineer or Terminal Manager stating:
(1) That the City has sold or contracted to sell the real estate so released for a consideration in cash, which shall be stated in such certificate, representing in the opinion of the signer the fair value thereof;
(2) That the real estate to be sold is not and will not be required in any manner or to any extent whatsoever for the proper and efficient construction, maintenance and operation of the Union Passenger Terminal, and that said construction, maintenance and operation will not be in any degree impaired by the sale of such real estate; and
(c)The sum in money stated in said certificate to be the consideration for any such property so to be released, less all usual and ordinary expenses incurred in connection with such sale as certified by the Chief Engineer or Terminal Manager.
“Section 2. Any money received in consideration of any such release by the Trustee shall, immediately upon receipt by the Trustee, be placed in the Construction Fund or, if received subsequent to the Completion Date, in the Principal and Interest Payment Fund.”

The Committee’s Power

The Committee and Olympia argue from Const, art. 14 § 31.3’s “general authorization” to “The City of New Orleans, acting through the Public Belt Railroad Commission, * * * in any manner it may determine * * * ”, that the City through Public Belt had determined its manner of using its power by turning over its power to the Committee.
However, this general authorization by the constitution was “to acquire, construct, maintain and operate”, and not only did not expressly include power to dispose, but, in our opinion, could not impliedly include that power since a later provision, in § 31.3 (B) (b), stipulates the property “shall in no manner be * * * alienated by the City of New Orleans, except as herein set forth;” and immediately provides for sale by the Commission Council of the City rather than by the City acting through 'Public Belt.
We are, for that reason, of the opinion that City of New Orleans v. Dupuy Storage and Forwarding Corp., 215 La. 795, 41 So.2d 721 (1949), is not controlling *278 here. There our Supreme Court held that La.Const. art. 14 § 26, in vesting “control, operation, management and development” of the Public Belt System exclusively in its Commission, also vested the power to sell and dispose of surplus land. But that constitutional provision, relative to Public Belt’s own operations, flatly prohibited hypothecating or alienating the Public Belt System, and was completely silent as to disposal of land no longer needed for the system. The provision before us is not silent, but expressly provides for disposing of unneeded property “in no manner * * except * * * by the Commission Council * *
Indeed we are somewhat at a loss to understand the Committee’s position here that it has authority to act as “the City through the Committee” independent of the City. We can appreciate its argument that its power under the Agreement to control and supervise acquisition and disposition, and the Indenture’s requirement for Committee action before “the City” can sell free of mortgage, together prevent the City itself from selling independent of the Committee.
The Agreement, sec. 17B, does authorize “the Committee on behalf of the City” to lease the station and all appurtenances, etc: But neither the Agreement nor the Indenture purports to authorize the Committee to sell surplus land. At most, the wording of the Agreement might authorize the Committee to “control” disposal by requiring the City to sell.
If control of disposing includes that power, the City argues it is obliged under its Charter, sec. 6-306, to sell land at advertised public auction, and not by private sale.
However, our objection to construing “control” so broadly is that the constitution, provides for the City Council to sell, lease, or dedicate to public purposes; and the power for the City to act through Public Belt or the Committee was only to acquire, construct, maintain and operate. Since the constitutional provision was so liberal in its grant of power to the City to act through Public Belt, and through a Committee, we are persuaded that the grant to the City Council was a deliberate reservation to the Council of the power to elect lease, sale or dedication. We believe this power, especially to elect to dedicate surplus property to public purposes, should not be considered waived or abandoned or delegated to the Committee unless the waiver or delegation were expressly recited. And even so, a waiver or delegation would be of doubtful validity in view of the Constitution’s specific placement of sale and dedication power in the City Council.
We construe the Committee’s “control” of disposition to be a negative power, a veto power, reserving to the Committee the right to prevent the City from selling or dedicating any land the City believes surplus but the Committee may wish to retain. The Committee’s power may be exercised by prior agreement with the City, to have an understanding that the City will merely sell rather than dedicate, since otherwise the Committee might refuse to declare surplus and the Trustee under the Indenture might refuse to release the mortgage. But these negative considerations do not constitute a positive power in the Committee to sell or order the City to sell.
One consideration which perhaps bears mention in this connection is that after all bonds are paid the Agreement may still be in force at the option of the railroad companies, sec. 79A. If the Committee has the power to sell or order sold, and the proceeds of sale to be applied in accordance with Agreement sec. 30C(i) (d) as stipulated by sec. 9A, the proceeds of sale would reduce the railroads’ cost of rental, which is contrary to City ownership of the property. This consideration suggests that Agreement sec. 9A’s reference to “hold temporarily and subsequently dispose” was itself not intended to relate to land other than such as was only necessary for tempo *279 rary use, as during construction. Yet this was the only “disposal” over which the Committee was given control, and the only disposal which the City committed itself to. We do not consider the owning of the subject property for a period of twenty years to be such a temporary holding as contemplated.
One argument by Olympia and the Committee which impressed us was based on the fact that the City had paid not one cent toward the station etc., and is not liable personally for the payment of the bonds. However, the City was obliged to pay 85% of the cost of grade crossing separations which were an essential part of the overall project, and this apportionment of cost is specifically recited by the Agreement, sec. 82(2), to be of the essence of the Agreement. Furthermore, the properties involved in the project were tax exempt and no payment in lieu of taxes was due during the first 50 years of operation, after which a payment, in the amount taxes would be, is due in the form of “rental”. Under the circumstances, we believe the fact City money was not devoted to the station etc. aspect of the project is no reason we should treat the City as having no actual interest in this attempted sale of property the City actually owns. We therefore cannot disregard the constitutional prohibition against sale except by the City Council.
Finally we note Olympia’s complaint that it is an innocent bystander to a dispute between the City and the Committee. We have already noted the Committee’s and Olympia’s good faith. We hold the sale a nullity not for any lack of good faith or innocence, but for lack of authority in the purported agent of the City, namely the Committee, to sell. To purchase the property from “the City through the Committee”, Olympia had to rely on a conclusion that the Committee had the authority to sell. Olympia’s mistake was not one of fact — there is no dispute as to facts —but one of law. Olympia’s good faith cannot change the law.
Nor, of course, can the law be changed by Olympia’s having paid some $22,000 for the property, nor the application of that sum against the bonds and (presumably) against the railroads’ normal rentals under the Agreement.
This proceeding being fundamentally a summary mandamus proceeding, we will leave for an ordinary proceeding Olympia’s entitlement to a return of the purchase price paid and all other rights of all parties, including the right (if necessary) of the Trustee to rescind the mortgage release. We here decide only that the Committee did not have the power to sell the land to Olympia and title remains in the City, and the City thus need not issue the building permit requested by Olympia.

Decree

Accordingly the judgment appealed from is reversed and Olympia’s suit is dismissed; all parties to bear their own costs.
Reversed and rendered.